## GEDDES ET AL. *v.* ANACONDA COPPER MINING COMPANY ET AL.

### APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 25. Argued April 25, 28, 1919; restored to docket for reargument December 8, 1919; reargued March 3, 4, 1920.—Decided January 24, 1921.

1. The Anti-Trust Act of 1890 provided the exclusive remedies for the rights it created; and it did not enable a private party to set aside a sale because the purchaser bought in pursuance of a purpose to restrain interstate commerce in a commodity. P. 593.

2. Although the federal question which was the basis of the jurisdiction of the District Court became settled adversely to the plaintiff's contention by decisions of this court rendered in other cases after this suit was begun, the jurisdiction nevertheless continues to decide the other questions in the case. *Id.*

3. The evidence fails to show that defendants constituted in 1911, when this suit was begun, such a combination in monopoly or restraint of interstate or foreign trade in copper, within the terms of the Anti-Trust Act of 1890, as would justify granting an injunction to the plaintiff under § 16 of the Clayton Act. *Id.*

4. When the business of a purely private corporation has proved so unprofitable that there is no reasonable prospect of conducting it without loss, or when the corporation has not, and cannot obtain, the money necessary to pay its debts and to continue its business, even though it may not be insolvent in the commercial sense, the owners of a majority of the capital stock, exercising their discretion in good faith, may authorize a sale of all the corporate property for an adequate consideration, and distribute among the shareholders the net proceeds after payment of debts, even over the objection of the minority shareholders. P. 595.

5. Such a sale, if otherwise valid, will not be set aside upon the ground that the consideration is not money but shares in another corporation, if the shares received as the consideration have such an established value in a general market that the shareholder receiving them may convert them at once into a cash consideration adequate for his interest in the corporate property sold. P. 598.

6. Where the minority shareholders of a corporation seek to set aside a sale of its property to another corporation negotiated and made

by boards of directors having a member in common, the burden is upon those who would maintain the transaction to show its entire fairness and the adequacy of the consideration. P. 598.

7. Unless clearly erroneous, a concurrent finding of the District Court and the Circuit Court of Appeals that the consideration for the sale was inadequate will be accepted by this court. P. 600.

8. When it appears from the evidence in a suit to set aside a sale that the consideration was inadequate, the court is not justified in affirming the transaction merely because no greater amount is bid upon offering the property at public auction. *Id. Mason* v. *Pewabic Mining Co.,* 133 U. S. 50, distinguished.

9. In a suit by minority shareholders to set aside for inadequacy of consideration a sale of all the property of their corporation to another corporation for a price paid in shares of the latter's stock, *held* that, under the pleadings, the court, having found the price inadequate, should have set the sale aside, and was without power to depart from the parties' contract by selling the property at auction for a cash price found adequate. P. 602.

245 Fed. Rep. 225, reversed.

THE case is stated in the opinion.

*Mr. T. J. Walsh,* with whom *Mr. C. B. Nolan* was on the briefs, for appellants.

*Mr. W. B. Rodgers,* with whom *Mr. L. O. Evans* was on the brief, for appellees.

MR. JUSTICE CLARKE delivered the opinion of the court.

With formalities, which are not assailed, a special meeting of the stockholders of the Alice Gold & Silver Mining Company, by resolution, ratified a contract in writing, theretofore authorized by the board of directors and executed by the officers of the company, for the sale to the Anaconda Copper Mining Company of all the property, of every kind, of the Alice Company. The officers were authorized and directed to execute such deeds and assignments as should be necessary to complete the sale; and a deed in form conveying all of the Alice property to the Anaconda Company was executed and delivered by

them on May 31, 1910. The consideration, thirty thousand shares of the capital stock of the Anaconda Company, was paid, and the purchaser took possession of the property.

Almost a year later, on May 8, 1911, at a special meeting of the stockholders of the Alice Company, a resolution was adopted, by the vote of more than two-thirds of the issued capital stock, in favor of dissolving the corporation, and the board of directors was authorized to take the court action prescribed by the laws of Utah, under which the company was organized, to accomplish such dissolution. Suit for this purpose was instituted in the appropriate state court.

On November 6, 1911, five months after the resolution in favor of dissolution was adopted, the bill in this case was filed by minority stockholders, praying for a decree, that the deed of May 31, 1910, be declared void, that it be delivered up and cancelled, that the consideration for it be returned to the Anaconda Company, and that all court proceedings to dissolve the Alice Company be stayed pending final decree in the case. The District Court approved and confirmed the sale, and its decree was affirmed by the Circuit Court of Appeals. The case is here on appeal.

The appellants claimed in the courts below and argue here that the sale was voidable for four reasons, viz:

(1) Because the purchase was made in pursuit of the purpose of the Amalgamated Copper Company and the Anaconda Company to monopolize the production of copper in the Butte Camp and to restrain the sale of it in interstate commerce and in the markets of the world, in violation of the Sherman Anti-Trust Act;

(2) Because the owners of less than all of the capital stock of the Alice Company could not authorize the sale of all of the property of the corporation over the protest of owners of a minority of the stock;

(3) Because the Alice Company could not lawfully acquire stock in another corporation; and

(4) Because the sale was negotiated by two boards of directors, with a common membership, and for an inadequate consideration.

We shall consider these claims in the order stated.

With respect to the first contention: It is now the settled law that the remedies provided by the Anti-Trust Act of 1890 for enforcing the rights created by it are exclusive and therefore, looking only to that act, a suit, such as we have here, would not now be entertained. *Wilder Manufacturing Co.* v. *Corn Products Refining Co.,* 236 U. S. 165, 174; *Paine Lumber Co.* v. *Neal,* 244 U. S. 459, 471; *United States* v. *Babcock,* 250 U. S. 328, 331. But the law has become thus settled since this suit was commenced in 1911, and the lower courts, upon the allegations in the bill, properly assumed jurisdiction and disposed of the case. *Busch* v. *Jones,* 184 U. S. 598, 599; *Clark* v. *Wooster,* 119 U. S. 322, 326.

It is, however, argued that § 16 of the Clayton Act (38 Stat. 730, 737), passed in 1914, was intended to, and does, modify the prior law, as declared by this court, and, since our decision will result in remanding the cause to the lower court, we shall consider its bearing upon the case.

The applicable provision of the Clayton Act is as follows:

"Sec. 16. That any person . . . shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings. . . ."

The contention of the appellants is that they will suffer irreparable loss by the sale of the Alice properties to the

Anaconda Company and that the sale should therefore be enjoined because that company and the Amalgamated Copper Company constitute a combination in restraint of interstate commerce within the prohibitions of the Sherman Anti-Trust Act.

The Amalgamated Copper Company, organized in 1899, is a holding company, and in 1911, when this case was commenced, it controlled by capital stock ownership the Anaconda Company which, in turn, held the title to the physical property which had been owned by other corporations, the union of which in this manner in the Amalgamated and Anaconda Companies constituted the alleged unlawful combination in restraint of interstate trade or commerce.

The evidence in the case renders it probable, that the promoters of the Amalgamated Company, when it was organized in 1899, entertained schemes or dreams of controlling the supply and price of copper in the interstate markets of this country and in the markets of the world, and that they did what they could to make that company rich and powerful.

But we are dealing with the Anaconda Company as it was in 1911 and with the extent to which its control of production and of prices appears in the record before us.

There is evidence that the total production of copper in the United States and Alaska, in 1899, was 581 million pounds, and of the Anaconda Company one million pounds, (probably an error, 100 million pounds being intended); but the total production of the world at that time is nowhere stated. The production in the United States in 1910, the year before the suit was brought, was 1,086 million pounds, and of this the Butte Camp, in which there were several mines other than those of defendants, produced 288 million pounds, or approximately 22 per cent. Here again there is no statement as to the total production of the world for that year.

Whatever the fact may have been, it is obvious that from such evidence as this it is not possible to determine to what, if to any substantial extent, the defendants restrained or monopolized the production of copper in the United States, much less in the world.

The evidence with respect to price control, although meagre, is more definite. The average price of copper in 1899, the year before the Amalgamated Copper Company was organized, was 17.6 per pound; in 1900 it was 16.1; in 1902, 11.6; in 1904, 12.8; in 1907, 20; in 1908, 13.2; in 1909, 12.98; 1912, 16.34; and in 1913, the last year for which the price is given, 15.26 cents.

It is obviously impossible to say that these fluctuating prices prove monopolistic control of the price of copper by the defendants.

No claim is made that the Anaconda Company restrained or restricted the production of copper, but so far as there is any evidence at all upon the subject it is to the effect that it maintained and perhaps increased the production in the Butte Camp.

Upon the case here made by the evidence it is impossible to conclude that the defendants constituted in 1911 such a combination, within the terms of the Anti-Trust Act, as would justify the granting of an injunction to the plaintiffs even under the provisions of § 16 of the Clayton Act, which we have quoted.

The decree of the lower courts as to this first claim must be affirmed.

The second contention is that the owners of less than all of the capital stock of the Alice Company could not authorize the sale of all of the property of the corporation over the protest of owners of a minority of the stock.

It is, of course, a general rule of law that, in the absence of special authority so to do, the owners of a majority of the stock of a corporation have not the power to authorize the directors to sell all of the property of the company and

thereby abandon the enterprise for which it was organized.
But to this rule there is an exception, as well established as
the rule itself, viz: that when, from any cause, the business
of a corporation, not charged with duties to the public, has
proved so unprofitable that there is no reasonable prospect
of conducting the business in the future without loss, or
when the corporation has not, and cannot obtain, the
money necessary to pay its debts and to continue the
business for which it was organized, even though it may
not be insolvent in the commercial sense, the owners of a
majority of the capital stock, in their judgment and discre-
tion exercised in good faith, may authorize the sale of all of
the property of the company for an adequate considera-
tion, and distribute among the stockholders what remains
of the proceeds after the payment of its debts, even over
the objection of the owners of the minority of such stock.
3 Thompson on Corporations (2nd ed.), §§ 2424–2429;
Noyes on Intercorporate Relations, § 111; 3 Cook on
Corporations (7th ed.), § 670, p. 2170, note.

The rule that owners of a majority of the stock may
not authorize the sale of all of the property of a going and
not unprofitable company, rests upon the principle that
exercise of such power would defeat the implied contract
among the stockholders to pursue the purpose for which
it was chartered. But this principle fails of application
when a business, unsuccessful from whatever cause, is
suspended without prospect of revival, and the law
recognizes that under such conditions the majority stock-
holders have rights as well as the minority and that it
should not require the former to remain powerless until
the creeping paralysis of inactivity shall have destroyed
the investment of both.

The case before us is a typical one for the application
of this exception to the general rule. The Alice Com-
pany was organized in 1880, under the general incorpo-
ration laws of the then Territory of Utah, with authority

to buy, sell, lease, hold, own and operate mines, mining claims, etc., with many enumerated incidental powers. It acquired the mining properties in controversy in this case and conducted prosperously the mining chiefly of silver ores, until 1893, when its business ceased to be profitable and was suspended. Extensive shafts and underground workings were permitted to fill with water and for seventeen years before the sale the only business done by the company was leasing the upper workings of the old mines, and limited parts of the surface for shallow workings, to "tributors," who operated in such a small way that, although the expenses of the company, chiefly for caretakers, were very small, its income was less, so that when the sale was made an indebtedness of about $35,000 had accumulated. The stock of the company was non-assessable, it had no resources but the real estate which was sold to the Anaconda Company, and the evidence is clear that to re-open and operate the mines on its property, or to open new mines, would have been very expensive and the prospect of profitable operation of them wholly problematical. Although its properties had a large speculative value, and therefore the company cannot be said to have been insolvent, yet it must be accepted as established by the evidence that there was no reasonable prospect of the company's being able to profitably resume the mining business for which it was incorporated, and that the only way in which the stockholders could realize anything from their investment was by sale of its property. Under such circumstances as these the sale of all of the property of the company, if authorized, in good faith and for an adequate consideration, by the owners of a majority of the stock would be a valid sale, which could not be defeated or set aside by the minority stockholders.

It is next argued that the sale here in controversy is void for the reason that the Alice Company could

not lawfully acquire and hold title to the stock in the Anaconda Company in which the consideration for the sale was paid.

Here again the general rule is that while, under the circumstances of this case, a sale of all of the property of a corporation could be authorized by the owners of less than all of the stock for an adequate consideration, it must be for money only, for the reason that the minority stockholders may not lawfully be compelled to accept a change of investment made for them by others, or to elect between losing their interests or entering a new company.

But it has been suggested that this rule, also, should be subject to the exception that when stock which has an established market value is taken in exchange for corporation property, it should be treated as the equivalent of money and that a sale otherwise valid should be sustained. Noyes, Intercorporate Relations, § 120, and cases cited. We approve the soundness of such an exception. It would be a reproach to the law to invalidate a sale otherwise valid because not made for money, when it is made for stock which a stockholder receiving it may at once, in the New York or other general market, convert into an adequate cash consideration for what his holdings were in the corporate property.

In this case the trial judge determined without difficulty the market value of the stock received in payment for the Alice properties, and it is, of course, public knowledge that there was a wide and general market for Anaconda stock. This third contention of appellants must be denied.

Finally, it is argued that the sale of the Alice properties is void because negotiated and made by two boards of directors having a member in common and for an inadequate consideration.

John D. Ryan at the time of the sale was president and a director of the Alice Company; he was also a director

and general manager of the Anaconda Company and had been its president from 1903 to 1909; he was elected a director and president of the Amalgamated Copper Company in 1909, and had been a director of each of the subsidiary companies of the combination prior to that year. In 1905 he obtained an option on the majority of the Alice stock for $600,000, and carried it until it was purchased by the Butte Coalition Company, an Amalgamated subsidiary, of which he was a director, and that company voted a majority of the Alice stock in favor of the disputed sale.

The record shows beyond controversy that Ryan was the representative of the chief investors in the enterprise involved in this litigation, that he dominated the conduct of the practical administration of the affairs of the Amalgamated and Anaconda Companies, and that he very certainly was in control of the boards of directors of the companies which were parties to the sale of the Alice properties.

The relation of directors to corporations is of such a fiduciary nature that transactions between boards having common members are regarded as jealously by the law as are personal dealings between a director and his corporation, and where the fairness of such transactions is challenged the burden is upon those who would maintain them to show their entire fairness and where a sale is involved the full adequacy of the consideration. Especially is this true where a common director is dominating in influence or in character. This court has been consistently emphatic in the application of this rule, which, it has declared, is founded in soundest morality, and we now add in the soundest business policy. *Twin-Lick Oil Co.* v. *Marbury,* 91 U. S. 587, 588; *Thomas* v. *Brownville, Ft. Kearney & Pacific R. R. Co.,* 109 U. S. 522; *Wardell* v. *Railroad Co.,* 103 U. S. 651, 658; *Corsicana National Bank* v. *Johnson,* 251 U. S. 68, 90.

The District Court found that the price agreed to be paid by the Anaconda Company was not an adequate one and the Circuit Court of Appeals refused to disturb that finding. With this conclusion we agree, applying the settled rule of this court that in suits in equity a concurrent finding by two courts on a question of fact will be accepted unless it be clear that their conclusion is erroneous. *Baker* v. *Schofield*, 243 U. S. 114, 118, and cases cited.

But the District Court, notwithstanding this finding of inadequacy of price, did not set the sale aside but ordered that the Alice properties should be offered at public auction by a master and that if no bid should be received for an amount greater than that which the Anaconda Company had agreed to pay, the sale should be confirmed. The offer at public sale was made, no bid was received, and the private sale to the Anaconda Company was thereupon confirmed. The Circuit Court of Appeals, by a divided court, affirmed that decree.

Both courts relied upon *Mason* v. *Pewabic Mining Co.*, 133 U. S. 50, as authority for approving the sale for a price which they found was inadequate, after a greater amount could not be obtained for the property when offered at public sale, and in this we think they fell into error.

In the *Pewabic Case* the charter period of the corporation having expired, a majority of the stockholders favored the organization of a new company, with the same amount of capital stock as the old, to take over the whole of its property and that there should be allotted to the stockholders the same number of shares which they held in the old company or, in the alternative, that those who did not desire the stock should receive the value of their shares computed on a basis of $50,000 for the entire property of the company. The minority stockholders favored sale of the property and division of the proceeds.

On bill filed by the minority stockholders the Circuit Court enjoined the transfer to the new company and ordered a public sale of the property by a master, with a proviso in the decree that if no bids were offered in excess of $50,000 above the debts of the company then the proposal of the majority should be carried into effect under the direction of the master.  Before the property was offered for sale each of the parties appealed to this court from separate parts of the decree.  On that appeal, in addition to a question of accounting, not material here, this court considered and decided only the question, whether on such a winding up of the affairs of a corporation the majority of the stockholders could lawfully compel the minority to either take stock in a new company or accept for their stock a value to be fixed by the majority.  No mention is made in the opinion of the court of the alternative character of the order of sale and, although it was subsequently shown that the price proposed was an inadequate one, there had not been any finding by the lower court that such was the fact when the case was decided here.  It is probable that there was no objection to this feature of the decree.  The minority stockholders, praying, as they were, for a public sale, for obvious reasons would not object to it, and the contention of the majority was that no sale at all should be ordered but that their reorganization plan should be adopted. The decree of the Circuit Court that the property should be sold at public sale was confirmed without any reference being made to the action ordered if the upset price should not be obtained and we must conclude that that part of the decree was not considered by this court.

As an original proposition, we cannot think that the amount offered for property at a public sale for cash, is such a measure of its value that the failure to obtain a bid at such sale for more should be accepted by courts as a sufficient reason for affirming a sale for a price which they

found, on other evidence, to be inadequate. In business life forced sales for cash are such a last resort for obtaining money that a sale "under the hammer" is synonymous with a sale at a sacrifice and prices obtained at such sales have usually been rejected by courts when tendered as evidence of value.

In this case, from evidence as to the character of the Alice properties, their location and surroundings, and from the opinions of experts, the trial court concluded that the price paid for them was inadequate, and we cannot doubt that from like or other evidence a more trustworthy conclusion could be obtained as to what their value was than would be derived from an offer at a public sale for cash.

To this it must be added that the resolutions of the Alice Company to sell and of the Anaconda Company to purchase were for a price named to be paid and received in designated stock. Neither contemplated a public offering of the properties and that a sale should be made at another price, greater than an amount decreed by the court, if it should be offered. Under the pleadings the court had power to confirm the sale if it was found to have been lawfully made, but only upon the terms on which the parties had contracted to make it and when the price was found to be inadequate, a decree should have been entered vacating and setting it aside, as prayed for by the appellants.

It results that the decree of the Circuit Court of Appeals must be reversed and the case remanded to the District Court for further proceedings in conformity with this opinion.

*Reversed and remanded.*

MR. JUSTICE MCREYNOLDS concurs in the result.