Common Pleas Court of Mahoning County.

FRANCES T. WICK, ET AL., EXRS. V. YOUNGSTOWN
SHEET & TUBE CO., ET AL.

Decided December 29, 1930.

*Squire, Sanders & Dempsey, Day & Day,* and *Harrington, DeFord, Huxley & Smith,* for the plaintiffs.

*Baker, Hostetler & Sidlo,* and *Kennedy, Manchester, Ford, Bennett & Powers,* for The Youngstown Sheet & Tube Company.

*Cravath, DeGersdorff, Swaine & Wood,* New York City, for Bethlehem Steel Corporation.

JENKINS, J.

These actions, submitted and tried together, seek an injunction restraining defendant The Youngstown Sheet and Tube Company from executing a contract to sell all its property and assets to defendant Bethlehem Steel Corporation, and seek a judgment holding the latter to have no interest in the property of the former by reason of such contract.

The consideration of these cases has been continuous for six months, to the exclusion of all other matters. A vast mass of evidence, oral and documentary, was offered, and the many, complex and often novel questions of fact and law involved were argued at great length, orally and upon printed briefs, during and following the trial.

The court gave intensive and continuous attention to all the evidence and arguments; heard and saw all the witnesses on the stand and weighed their statements; carefully studied the briefs and made independent research into the questions presented.

I have arrived at a decision on the issue before me, and will dispose of these cases through the following comparatively short but sufficiently determinative summarization of what I find to be the basic controlling principles and facts involved. A multitude of other problems of fact and law enter into these cases. I do not pass on them because I do not reach them.

No pretense is made of setting forth all the facts, enough only being given for a general understanding of the situation under review. No attempt is made to marshal all legal authorities or all facts in the record supporting my conclusions.

The contract sought to be enjoined was drafted on March 2nd, 1930, by attorneys for both corporations after conversations and negotiations beginning January 2nd, 1930,

privately conducted between some of the officers and directors of both corporations. The proposal in any of its phases did not come before a meeting of the board of directors of the Youngstown company until March 12th, when it was approved by a vote of six, another voting no, two, including one who was a director of both corporations, not voting, and two being absent.

The fact that any such negotiations had been in progress was not made known to one director who did not vote, until March 7th, nor to the director who voted no, until March 10th, the day for which a directors' meeting had been first called to consider and act on the proposal. That these negotiations had culminated in a written contract was not made known to either of these directors until the meeting of March 12th.

An adjournment of the meeting set for March 10th was had until the 12th. At this meeting a suggestion for a postponement was denied without a dissenting vote, and then the vote on the proposal was taken as stated above. Notices of a special meeting of shareholders to be held April 8th to act on the authorization of the proposal were ordered and sent to all shareholders of record as of March 22nd, the record date fixed by the directors for determination of the shareholders entitled to such notice and to vote at such meeting. In the resolution submitting the proposal a proxy committee was constituted and a recommendation to the shareholders to authorize the proposal was included. A circular letter and proxy form was approved and sent to all shareholders.

Thereafter a committee of shareholders opposed to the sale and dissolution of the Youngstown company was formed. After a heated proxy campaign conducted by these committees, an assembly of shareholders convened on April 8th and shares more in number than the required statutory two-thirds of all common shares outstanding were counted and certified by the inspectors as having been voted in favor of authorizing the contract proposed.

The present suits were brought within the time fixed by statute, to enjoin the execution of such contract on the grounds, among others, that the provisions of law relating to the sale or exchange of all the corporate assets had not been complied with in the attempted action and authoriza-

tion, and that in connection with such contemplated sale and their acts and conduct in furtherance thereof the directors of Youngstown were guilty of breach of duty tantamount to fraud.

The proceedings in question were by virtue of Section 8623-65, General Code, sufficient of which is included in the following:

"A corporation may, by action taken at any meeting of its board of directors, sell, lease or exchange or otherwise dispose of all * * * of its property and assets * * * upon such terms and conditions and for such considerations, * * * as its board of directors deems expedient, when and as authorized by the vote of holders of shares entitling them to exercise at least two-thirds of the voting power on such proposal, * * * at a shareholders' meeting called for the purpose."

To sell all its corporate assets a corporation can do so only by the action of its board of directors, authorized by the requisite number of shareholders. The action is not by the shareholders. It is by the board of directors acting as an unit. That it must and can act only as an unit is clear beyond controversy by the legislative use of the word "deems," a verb in the singular number.

This unit action of the board must be at a meeting, and there the terms, conditions and considerations of the proposed sale of all the corporate property and assets must, by the board acting as an unit, be deemed expedient. "Deems" means "to judge or to form an opinion; to determine." To deem expedient thus requires and pre-supposes fully informed judgment on the part of each and every member of the board present to take action, after reasonable opportunity afforded for investigation, weighing and determination at the meeting of all the terms, conditions and considerations entering into the proposal.

Without going into details, the evidence conclusively and irrefutably to the court's mind shows that several members of the board who voted affirmatively either had no reasonable opportunity or sufficient facts for the necessary investigation and formation of any fully informed judgment at the meeting, as required by the statute, or, having such opportunity, made no independent investigation, were not supplied with adequate information, but acted on the opinion or advice of other directors.

The director voting no frankly said he didn't have sufficient knowledge to judge of the merits of the proposal, which the statute mandatorily required of him as one of the board previous to its action as a whole. His lack of information and of opportunity for obtaining it was well known to all, and is a shocking and outstanding feature of this case. Another of the directors was not fully informed on the matter and for that reason did not vote. Each should have been given time and each should have demanded time. They could not waive their rights; these rights were not personal, they were representative. It is not a question of mere majority action; it is informed action of every director, whether affirmative or negative, after qualifying by investigation and knowledge to deem the considerations, terms, etc., expedient. The corporation and its shareholders were entitled to these directors' separate judgment, their arguments when fully informed, as well as to those of a favorable majority. Each of them and all the shareholders had an absolute right to this.

Most clearly the meeting of the board of directors was held with unseemly precipitation. How any action having to do with such a vital matter as the sale of all the corporate assets and the ending of the corporate existence, can, in the absence of full knowledge and consideration by each director of the factors specifically required by the plain language of the statute, be held to be a compliance therewith this court is unable to see. The whole is the sum of all its parts. It is only when the whole, the board of directors, "deems" the terms and considerations expedient and is in a position to so do, that the statute is complied with. Then, and only then, is a majority vote effective to sell all the corporate assets when and as authorized by the requisite vote of the shareholders.

Our Supreme Court in *State ex rel.* v. *Urschel*, 104 O. S., at page 182, has announced the settled law of Ohio thus:

"All powers of a corporation must be exercised in conformity with the manner pointed out by statute in all cases where the statute contains regulatory provisions, and the failure so to conform with reasonable strictness renders any attempted action invalid."

At the threshold of this entire proceeding is the legality of the action of the board. The natural and obvious mean-

ing of the language used in the section applied to the plain facts forces the conclusion that there was no such action of the board as is therein required. Strict compliance with this statutory provision is not too much to ask when, as here, the existence of the corporation is at stake. The record establishing the failure of the board of directors to conform to the plain provisions of this controlling statute, its attempted action is therefore invalid.

There is no need to go further; but the court is appealed to as chancellor, and equitable principles if applied to the attempted action of the board would lead to an identical result. This section of the corporation act as far as it sets forth the manner in which a board must act is only a clearly expressed enunciation of what has always and everywhere been held by courts of equity to be the duty and manner of action of a board of directors of a corporation. The action of a corporation through its board of directors is by the whole board present at its meeting. The duty of directors is to be performed as a trusteeship in an aggregate capacity. As trustees, they have no power, acting as individuals, even by a majority of individuals constituting the board, to act for or bind the corporation.

Aggregate action of the board as trustees, implies and requires a reasonable opportunity for each and every member to have all the information he reasonably can obtain, or that the other members have, on the affairs of the company to be acted on, in order by his intelligent, informed judgment, through deliberation at a meeting with his fellow trustees, he being as fully informed as they and expressing thereon his views to them, to take part on terms of equality with them in directing the action of the whole board in the interest of all the shareholders whom he represents just as much as each and all of the others.

The shareholders have a right to such informed expression of the individual viewpoint of each of the several directors acting as a whole; and to deny such full opportunity to any director, minority or majority, even though this is done by men of the highest integrity, acting in their own conscience according to an honest belief that they are serving the very best interests of the corporation, is a wrong done to the corporation and requires a court of

equity to imply fraud. It is not the performance of their duty as the directors see it, but its performance as the law and equity require it, that controls.

Such denial, wholly aside from the presence of good intention or absence of bad motive, is abuse of corporate control, is a failure to give consideration to the interests of a minority which a majority would want were the positions reversed. · It is a denial of the rights of each and all of the shareholders; it is breach of duty; it is not the action of the corporation. Any action so had is not action by a board of trustees or directors as required by law, is not binding on the shareholders and is void.

A court sitting in equity is asked to apply to the evidence its conscience, that is, its judgment of the proper standard of conduct required to be exercised by directors to each other and to corporate shareholders. This standard, applied by the chancellor, is not created by him as an individual, nor by the law through him, but is the reflection, through him and the law, of the standard of conduct held proper today by the conscience of the people of this country in respect of its creatures, corporations.

No matter how powerful the corporation, how extensive its property holdings or financial interests, its workings and very existence even, are subject to the direction, approval and will of the people, expressed through its government, laws and courts. The operations of a corporation must, to repeat, accord with the standards of conduct held by its creator, the state and its people; such operations are measured by the test of this public consent and approval applied, by the chancellor, to the particular facts in evidence.

A court of equity cannot be called on to pass on the propriety of business policies or plans proposed as between majority and minority directors or shareholders, or between the directors and shareholders; it is not concerned with the economic desirability or effect of such plans or their financial or business advantages.

Aside from consideration of the weight to be given testimony as the same may be affected by bias, interest and veracity, the character and motives of the men involved are not in question. These are not in issue. Personalities, except as is true of any witness in any case, are of no

concern to me as a court. As chancellor I have the duty of impersonally measuring the acts and conduct of directors and shareholders of a corporation, and the same measuring stick would and does apply to any directors and shareholders, known or unknown, of any corporation, big or little, anywhere.

I am not here concerned, as chancellor, with what the customary conduct of directors has been among themselves and to the shareholders; not with what has been the general practice as to opportunity afforded directors to each other or to the shareholders to inform themselves as to a proposed action; not with what has usually been the nature, clearness or adequacy of the information on which directors have acted or which they have furnished to fellow directors or to the shareholders; not with the prevalent lack of interest of shareholders in corporate affairs. The conduct under review is referable to a code and subject to a judgment other than their own will or the general practice.

The contract voted on by the directors of Youngstown was to sell all its assets to Bethlehem. In this proposed sale and purchase the two companies dealt at arms' length. One of the directors of the former was also a director of the latter. He actively participated in the negotiations. A director whose official relation with both corporations was such as his in a matter of such vital interest to both, could not help, by the very nature of the transaction, but be in an adverse relation to one or the other. He could not be neutral. He could not act wholly as trustee for the selling corporation. He simply had no right to be or act as its director as he did in the matter.

"No man can serve two masters." No question of the fairness of the transaction or of his acts or intent is necessarily involved. The doctrine which here controls arises solely from the nature of the transaction, the relation of the parties thereto and the director's relation to them.

As director of the corporation which sought to obtain control of the other by purchase the common director, in equity, is not permitted to act in furtherance of a plan looking to such control and purchase. So his acts, his membership on the board of the selling corporation, his presence and approval of the project at the meeting, wholly aside from the fact of voting or not voting thereon, were

in equity a breach of trust and against public policy. Therefore the attempted action being, as the evidence shows, influenced and promoted, if not actually originated, by a common director having adverse interests, will be set aside by a court of equity at the instance of shareholders.

As to one or two of the directors the common director's part in the negotiations was kept secret up to approximately the time set for action on the determined upon and drawn up contract. The evidence is clear to the court that he knowingly was not acting for all the shareholders of Youngstown in that steps were taken to delay advising them and certain representatives on the board of the existence of and point to which the privately conducted negotiations, fully known to him, had gone. He was, therefore, in this not acting for Youngstown but for the other company, even though honestly intending to act in what he believed to be for the best interests of the Youngstown company. Again it is not the intention with which we are concerned; it is the fact, the nature of the transaction, the relation of the director and the parties, and the application of law and equity to all these. Upon the broad principle of equity applicable to these facts, the attempted action of the directors was, for these reasons, vitiated and void.

The common director necessarily knew of the Bethlehem bonus system. He admittedly knew that it was an important topic and should be discussed, and stated that if he had known its full details he would have told the directors about it, since it was an important matter both to the directors and the shareholders. He was in a position to find out about it, aside from whether, as a director of Bethlehem, he is not conclusively held, as a matter of law, to have known all about it. His duty to have fully informed himself and his fellow directors and shareholders of Youngstown is clear.

This bonus system entered materially into the consideration for the sale and into the value of the stock of Bethlehem to be received in exchange for their Youngstown holdings by the latter's shareholders. These bonuses, which in their actual nature were salaries related to current earnings, were matters which the directors and shareholders of the

Youngstown company had a right to know in this proposed transaction.

Two other Youngstown directors, aside from the common director, knew enough of such a system to be put on their inquiry and to exercise ordinary care to investigate and report its nature and effect first to the directors and then to the shareholders. The circumstance that no such investigation or revelation was made by any director cannot be reconciled in equity with the performance of the fiduciary duty owing the shareholders of Youngstown, either directly to them or indirectly to them through the other directors.

The statute (Section 8623-65, General Code) prescribes that action is to be taken by the board of directors, deeming terms, considerations, etc., expedient, at a meeting. The evidence shows that certain directors, in advance of the meeting, worked out all the details of the deal, had these drawn up into a formal contract, and had determined upon a definite course of action to be taken thereon at the meeting. The corporation had a right to their free and best judgment formed in a meeting provided for by the statute, after free and full consultation at such meeting with all the members equally informed; it had a right to have them come to such a meeting without their free judgment being in any way restrained, impaired or predetermined.

Action of the board of directors at a meeting which is merely a ratification by a majority of a previously agreed on course, is not compliance with the statute, is contrary to public policy and void. The court will not inquire into whether the result of the attempted action would be advantageous or injurious. Taken in this manner it is against the public interest to recognize it as valid.

Adequacy of the consideration is in issue. Where, as here, minority shareholders of a corporation seek, by challenging the fairness of the transaction, to set aside a sale of its property to another corporation, negotiated by boards of directors having a member in common, the doctrine consistently and emphatically applied by the Supreme Court of the United States is that the burden to show the full adequacy of the consideration is upon those who, so challenged, would maintain the transaction as valid and fair. That august court declares this rule to be founded

in soundest morality as well as the soundest business policy. *Geddes* v. *Anaconda Co.*, 254 U. S. 590, at page 599.

The importance of the accounting features of the case arises from the fact that the ratio recommended by the accountants of both companies, covering such features alone, and adopted as a fixed basis for later negotiations resulting in a final ratio of 1 1/3 shares of Bethlehem to 1 of Youngstown, was 1 1/5 to 1. The accounting systems of the two corporations were radically divergent. The accountants engaged to recommend a ratio were not given a free hand to the problem as expert professional men should have been in a problem so involved and technical. They were arbitrarily required to formulate a ratio practically exclusively on the basis of the respective earnings for 1929.

It is agreed on all sides that to get any precise ratio was impossible; that at best the ultimate conclusion would be a matter of judgment. In fairness to the able experts who undertook to arrive at a basic accounting ratio, they were so restricted in their work by the limitation imposed by their clients, that their recommendation could hardly be called their best judgment. It was certainly not their untrammelled judgment.

The court had before it another ratio arrived at by an equally competent set of accountants. They took a wider base than the earnings of one pre-selected year, and arrived at such a different ratio by adjustments for comparability that their conclusions, if accepted, would show the consideration agreed upon to be shockingly and grossly inadequate.

These widely different results were the opinions of expert witnesses. The value of such opinions depended on the established underlying facts. To test their comparative value the court was confronted with the situation that while all facts and witnesses required for a knowledge of Youngstown's accounting status were available, many details of Bethlehem's accounts necessary for determning whether certain adjustments for comparability were needed or were properly made were absent, as were also witnesses who, as accountants or officers of Bethlehem, possessed first hand information which on examination from the stand would have furnished basic enlightenment to the court as to this important branch of inquiry. It is a maxim that

all evidence on this point is to be weighed according to the proof which it was in the power of one party to produce, and didn't.

Some phases of the attempted adjustments for comparability of the two corporations, included in the accountants' ratios, were related to physical properties, manufacturing processes and actuarial problems, obviously outside of the determination of the most skilled accountant, others were of important items for charging which there is no hard and fast accounting rule.

I have been impressed, in this case, as to both companies, with the divergence of accounting practices and the arbitrary technical treatment of accounting items. These have resulted herein in much difficulty of understanding and in use of time, and made what should be a comparatively simple evaluation of two similar objects, a complex mathematical problem of incommensurable quantities.

From this I deduce that action should be taken, by cognate industries, voluntarily and not by legislative compulsion, with the co-operation of the accounting profession, to make uniform, as far as possible, their accounting practices, for purposes of setting up uniform standards of comparison of accounts, earnings and values for the guidance and necessary knowledge of directors and shareholders, as well as of investors generally.

I am further of opinion that directors, shareholders and, incidentally, courts, should have a clear, explicit presentation of the accounting facts relating to a corporation in form and language which, in accordance with common sense, will enable the ordinary reader, without hiring a technical interpreter, to determine the actual state of the company's business, prospects and value. Corporate statements and reports are for the information of laymen, not of skilled accountants. Such purpose being so fulfilled, a repetition of the months spent in this case, with the use of language and schedules that not even skilled executives in the corporations involved could understand, would be done away with.

For all the reasons stated, the court was without any sufficiently supported facts to clearly judge of the consideration; and for the same reason, but more obviously,

the directors in the first instance and the shareholders in the second, were also without any such basis for forming such judgment.

Though months of close attention to and weighing of witnesses, exhibits and arguments have been given the problem, a study of the accounting phases of the consideration makes, to my mind, no definite conclusion possible that the final ratio was adequate. Indeed, to put it mildly, it must frankly be said that in the present state of the record grave doubt as to the adequacy of the consideration exists. That being so, the one upon whom rests the burden must, as a matter of law under the cited holding of the Supreme Court, fail on the issue of adequacy of consideration.

The attempted action of the directors being invalid on the various grounds heretofore stated, a later authorization by the shareholders, even by unanimous vote, would be void also. Under our statute a sale of all corporate assets is not made by the shareholders; they can only authorize action of the board to that end which complies fully with law and equity.

Under the statute the sale by a corporation of all its property and assets can take place only when and as the action of the board of directors is authorized by a requisite majority of the holders of shares, at a shareholders' meeting called for the purpose. Since the action of the directors required the sanction of the owners, the shareholders, the former have no other or greater rights as to requisite information respecting the proposal to be authorized than the latter. The shareholders, as owners, had an absolute right to have that full and complete and accurate information which was necessary to render their authorization or ratification effective. This does not mean at all that, if so informed, they would necessarily disapprove.

Adequacy of information to which shareholders in such a meeting are entitled does not mean all the minutiae of details and factors before the directors, nor any particular quantum of such information. But they are entitled to a clear, explicit presentation of all the facts such as will enable an ordinary person to form his own judgment as to the propriety of the proposal,—the same independent informed

judgment that the directors themselves are required to exercise. It meant, in this case, among other things, a presentation in ordinarily understandable form of the accounting factors and bases which formed so fixed and large a part of the compensation, the agreed on basis of exchange.

A most important feature of this case is that the basic accounting ratio arived at by the accountants engaged by officers of the two corporations was orally and privately presented to the latter. There never was any written report submitted on this vital phase, nor even any oral report directly to the directors. The few papers and schedules given to the director who presented to the board this oral report at second hand were not fully comprehensible by him or them, were not even seen by any of the other directors, and were, as used, if not incorrect, at least misleading in that they required for proper understanding the interpretation and supplementary information that the accountants alone could give.

The directors had no sufficient accountants' report at their meeting on which they could base an informed judgment, or individually or as a whole deem that phase of the consideration expedient. What they did not have they could not and did not give to the shareholders who were entitled, on demand, to such information in order to informedly pass on such consideration by a vote of authorization.

It is desirable that shareholders receive the maximum of information about corporate affairs, though this is necessarily limited by the difficulty of analyzing intelligently in a report the complexities of the business in hand. But the directors had no such report at the board meeting and took no steps before or after their attempted action to secure any and transmit it to the shareholders. Their duty was plain, when demanded by shareholders, to take aggressive steps to obtain from the accountants such report and give it in understandable form to the shareholders.

Their duty was equally plain to ascertain and disclose to the shareholders the extent and effect of the Bethlehem bonus system on the exchanged shares. Silence when the duty is to speak is as much a breach of duty as the spoken or written misleading word. Their duty as fiduciaries was constant and unqualified fidelity.

All of the shareholders had the further right to a full disclosure, previous to the authorization sought, of all acts of a common director of the two corporations originating, promoting and leading up to the attempted action of the directors.

The circular of April 1st, to all the share holders, which included a report signed by three accounting firms, was of such character, whether calculated or not, as to have had the effect of obtaining proxies from the shareholders. In place of this report there could and should have been a frank and clear report of the original accountants themselves, signed by them and given out as such.

The manner in which this three accountants' report was drawn up and circulated had a misleading tendency, whether intentional or not is immaterial. Its contents, presentment and phraseology, wholly aside from whether it was correct or not or by whom it was actually written, were not, could not have been, in the short time and with the limited data at their disposal, the actual determination of these accountants as to all it purported to show. This was unknown to the majority of shareholders, upon whom its probable effect was obvious. The decision and will of the statutory majority of shareholders must be equitably and lawfully obtained and exercised. By reason of the character of this circular and accompanying report and the shareholders' probable reliance thereon, equity would intervene by injunction.

Full, accurate and candid publicity and adequacy of information owing as a fiduciary duty by the directors to the shareholders previous to their authorization of the board's action is, by the circumstances in evidence, shown not to have been furnished, and on that ground equity will grant relief.

On the several equitable and legal grounds herein set forth the right of the plaintiffs to the relief asked is most clear. These grounds show neither statutory nor equitable action by the board of directors and show the shareholders to have been in no equitable or legal position to authorize any such action.

My conclusion is fundamental and elementary. The threshold of corporate action was never crossed, so why should the court proceed beyond? It would be superfluous if not presumptuous for me as a court of first instance to

undertake to set out in full my reasonings and conclusions on each single factual and legal problem arising in the forest of questions included in the matters I have passed upon and in those I have considered but not herein decided. My duty as I see it is done when as a court I have arrived at a clear and convincing answer to the issue before me.

Judgment is for plaintiffs and permanent injunction allowed as prayed for in the petitions.

Common Pleas Court of Montgomery County.
IN RE LIQUIDATION OF THE MIAMI SAVINGS & LOAN COMPANY, OF DAYTON, OHIO.
Decided December 23, 1933.

*John Bricker,* Atty. General, *Turner & Turner, L. H. Mattern, Herbert D. Mills,* for Supt. of Building & Loan Associations.

SNEDIKER, J.

Under favor of Section 687-11, General Code of Ohio, the superintendent of building and loan associations of