**DE LAMAR MINES OF MONTANA, Inc., v. MACKAY et al.**

No. 8883.

Circuit Court of Appeals, Ninth Circuit.

May 29, 1939.

Harry L. Fisher and Vestal P. Coffin, both of Boise, Idaho, for appellant.

R. Leslie Hedrick and E. A. Walton, both of Salt Lake City, Utah, for appellees.

Before DENMAN, MATHEWS, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal from a decree of the district court denying cancellation and rescission of certain assignments of a mining lease and option, dismissing appellant's bill of complaint seeking such relief, and quieting title in the mining lease as against appellant in the appellee Centennial Gold Mining Company, hereafter referred to as Centennial.

The lease, dated June 14, 1933, covered certain mines and mining property in the State of Nevada, known as the Bull Run property. An option to purchase the property at a stated price was granted by the lessors to L. W. Gardiner, the lessee. Appellant DeLamar Mines of Montana, Inc., an Idaho corporation, hereafter referred to as DeLamar, acquired the lessee's interest in the lease and option sometime prior to August 14, 1934.

An agreement, dated August 14, 1934, was made with DeLamar by the individual appellees looking toward the formation of a corporation under the laws of Nevada and providing, inter alia, that upon execution of the agreement DeLamar would assign and transfer to appellee Alonzo Mackay, as trustee, the lease and option, to be transferred in turn by the trustee to the Nevada corporation immediately upon its incorporation and qualification. Thereupon DeLamar executed and delivered to Mackay, as trustee, an assignment of the lease and option.

The agreement of August 14, 1934, provided for payment to and acknowledged receipt by DeLamar of $500. It provided that the Nevada corporation to be organized by the trustee to take over the lease and option should have a capitalization of 1,500,000 shares of par value of five cents per share, and that as consideration for the lease and option the new corporation should "pay * * * one million shares of its capital stock", 549,800 shares of which were to be distributed to DeLamar and the remainder to certain named individuals. It was further agreed that the trustee was to provide $10,000 in cash for the construction of a mill and the purchase of certain described equipment.

September 12, 1934, Centennial was organized and incorporated as a Nevada corporation, with total authorized capital stock of 1,500,000 shares of the par value of five cents per share. Of this amount, 1,000,000 shares were subscribed for in the articles of incorporation which provided that the stock therein subscribed for "is fully paid up by the transfer and assignment to this corporation of that certain" lease and option above referred to. Mackay, as trustee, assigned the lease and option to Centennial on or about September 17, 1934.

On September 17, 1934, in Salt Lake City, Utah, Centennial issued and delivered to DeLamar mediately through one C. R. Bernard, DeLamar's president, a certificate of stock for 548,000 shares of the capital stock of Centennial. This was accomplished by issuance of certificate No. 1 to Bernard, transfer of the shares from Bernard to DeLamar, cancellation of the Bernard certificate and issuance of a new certificate (No. 7) for the same number of shares to DeLamar, all occurring on the same day.

About February, 1935, DeLamar sold the 548,000 shares, plus 2,000 additional shares which it had acquired mediately through Bernard and L. W. Gardiner, to J. Free for $9,500. During some 19 months which elapsed between September, 1934, when the lease was transferred to Centennial and DeLamar received the Centennial stock certificate, and April, 1936, when DeLamar made its purported tender seeking to avoid the transaction, Centennial invested $39,000 in the development and improvement of the leased property and, we may conclude, the value of the same became apparent. DeLamar then sought to avoid the transfer of the lease and regain the property whose value had been proved by the expenditure of the Centennial money and its enterprise.

An assessment on Centennial stock was levied March 28, 1935, but that on the 548,000 shares represented by certificate No. 7 was never paid. Suit was brought by Free attacking the validity of the assessment and negotiations between Centennial and Free resulted in a contract to pay Free $9,000. Free dismissed the suit and Centennial got back from him the certificates for the 550,000 shares. DeLamar in no way participated in the transaction by which the Centennial regained the shares which DeLamar had sold to Free for $9,500.

Centennial, having obtained the stock from Free, had not paid him the $9,000 when DeLamar acquired Free's contract against Centennial. Prior to its commencement of the present suit, DeLamar tendered to Centennial the contract of

August 14, 1934, between DeLamar and the individual appellees, and the contract of settlement between Centennial and Free, and demanded that the lease be transferred to it. DeLamar did not tender the moneys expended by Centennial in developing the mine. Centennial refused to transfer the lease, whereupon this suit was brought for the cancellation of the assignments of the lease, its return to DeLamar, and for quieting title in the lease in DeLamar.

DeLamar seeks to set aside the transaction whereby Centennial acquired the lease and option on the grounds that there was violation (1) of the Business Corporation Act of Idaho relative to transfer of corporate assets, (2) of the provisions of the State Securities Act of Utah, (3) of the constitution and statutes of the State of Utah relative to foreign corporations entering into contracts within that state, and (4) of the doctrine of public policy "stated by the Supreme Court in Geddes v. Anaconda Copper Company", 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425.

■■ (1) *Transfer of lease not void under Business Corporation Act of Idaho relative to transfer of corporate assets.*

DeLamar is an Idaho corporation. The statutes of that state with respect to the voluntary transfer of the assets of a corporation provided:

"1. A voluntary sale, lease or exchange of all the assets of a corporation may be authorized by it upon such terms and conditions as it deems expedient, *including an exchange for shares in another corporation,* domestic or foreign.

"2. If the corporation is able to meet its liabilities then matured, such authorization shall be given at a meeting of shareholders, duly called for that purpose, and by such vote of the shareholders as may be provided for in the articles of incorporation or, if there be no such specific provisions, then by the vote of the holders of two-thirds of the voting power of all shareholders. *If the corporation be unable to meet its liabilities then matured, such authorization may be given by the vote of the board of directors.*

\* \* \* \* \* \* "

(Emphasis supplied.) Business Corporation Act of Idaho, Idaho Code Ann., 1932, Sec. 29-144.

On August 14, 1934, the board of directors of DeLamar met and passed a resolution authorizing execution of the contract pursuant to which the lease and option were to be transferred.

DeLamar alleged in its complaint that at the time of making the agreement of August 14, 1934, it was able to meet all its liabilities then matured. The answer of the appellees constituted a specific denial of this allegation. We regard the date of the authorization of the transfer rather than the date of the making of the agreement as the pertinent date under the wording of the statute, but since in this case the dates are the same we do not regard the defect in the complaint a material one.

The evidence is conflicting as to whether at the time the resolution of August 14, 1934, was passed at the directors' meeting purporting to authorize the transfer of the lease and option DeLamar had any matured liabilities and, if so, whether it was able to meet them. There was sufficient evidence to sustain a finding that there were such matured liabilities which DeLamar was unable to meet. The district court found that: "\* \* \* shortly before August 14, 1934, the said plaintiff and the said Bernard, Nesby and Gardiner [members of the board of directors and officers of DeLamar] solicited the individual defendants for financial assistance in the promotion of a corporation to take over and develop the mining property described in the lease referred to in the complaint, and then and there represented, which was true, that neither the plaintiff nor its stockholders were pecuniarily able to finance in any way the development of said mining property, or to do the things, or any of them which were required to be done by the terms of said lease, in order to keep the same alive and in good standing, and they further represented to these individual defendants, which was true, that neither said plaintiff nor its stockholders were able to meet, pay or satisfy the then existing and matured liabilities of said plaintiff, \* \* \*."

Considering the evidence de novo, we find there were matured liabilities of DeLamar on the date authorization of the transfer of assets was given by its board of directors and that it was unable to meet them.

Appellant DeLamar would have us limit the meaning of "liabilities" as used in the statutory phrase "liabilities then matured" to "liabilities appearing as such upon the books of the corporation or established by judgment of a court \* \* \*". We per-

ceive no justification for placing this limited construction upon the statutory language. We regard the word "liabilities" as including that which the corporation is shown to have been under obligation to pay, irrespective of whether it appeared as such upon the books of the corporation or had been established by judgment in a prior proceeding. There is no merit to the contention that the transfer of the lease violated the corporate law of Idaho.

■ (2) *No right under State Securities Act of Utah to avoid transfer of lease.*

It is contended that Centennial issued and delivered the certificate of stock for 548,000 shares to DeLamar in Salt Lake City, Utah, at a time when the capital stock of Centennial had not been registered in compliance with the provisions of the State Securities Act of Utah (Title 82, Chap. 1, Revised Statutes of Utah, 1933), and, for the purposes of this case, we assume, without deciding, that there was a sale in violation of that Act. Under that Act a sale or a contract for sale is voidable, but not void, if made in violation of its provisions. *

We have seen that Centennial acquired the stock from Free for $9,000, to be paid from certain proceeds of the mining operations. DeLamar acquired Free's rights under the contract between Free and Centennial and tendered this contract to Centennial, contending that it was an adequate tender. It may be open to question under the State Securities Act of Utah whether for purposes of a suit such as this one the tender by the purchaser of something in lieu of securities it had purchased would be a sufficient tender. This we do not decide.

At best, the situation for DeLamar is no stronger than if, instead of selling the stock in February, 1935, to Free for $9,500, it then had sold it to Centennial for that sum and then watched the development of the mine under the enterprise and expenditure of Centennial until 13 months later when the values became apparent, and then tendered the $9,500 to Centennial and sought to avoid the transfer. It seeks to obtain the benefit of the development after giving up for a consideration all the possible liability through assessment for costs and risks in the hazardous mining venture. Certainly such a tender would not be doing the equity necessary to secure the equitable relief DeLamar seeks.

DeLamar is estopped from asserting the tender of the Free contract, under the circumstances here obtaining, as basis for setting aside this mining lease transaction. It cannot divest itself of the stock and permit its acquisition by the company, and then, without risk to itself, take from Centennial, through a court of equity, the successful results of the latter's large investment—at what is no net cost to itself and what would be a great loss to Centennial and its numerous stockholders.

Apart from estoppel, the delay of 19 months in seeking rescission of such a mining lease transaction as is here under consideration constituted laches. Both in the Utah and the federal courts, the circumstances of a particular case may be such as to permit the invocation of the defense of laches to defeat the claim of equitable relief, even though the suit be brought within the time limited by a statute of limitation. Smith v. Smith, 77 Utah 60, 291 P. 298, 301; Jones Mining Co. v. Cardiff Min. & Mill. Co., 56 Utah 449, 191 P. 426, 429, 430, relying on Patterson v. Hewitt, 195 U.S. 309, at page 321, 25 S.Ct. 35, at page 38, 49 L.Ed. 214, from which it quotes: " 'There is no class of property more subject to sudden and violent fluctuations of value than mining lands. A location which to-day may have no salable value may in a month become worth its millions. Years may be spent in working such property apparently to no purpose, when suddenly a mass of rich ore may be discovered, from which an immense fortune is realized. Under such circumstances, persons having claims to such property are bound to the utmost diligence in enforcing them, and there is no class of cases in which the doctrine of laches has been more relentlessly enforced.' "

---

* "Every sale or contract for sale made in violation of any of the provisions of this chapter shall be voidable at the election of the purchaser, and the person making such sale or contract for sale and every director, officer or agent of or for such seller who shall have participated or aided in any way in making such sale shall, upon tender to the seller of the securities sold or of the contract made, be jointly and severally liable to such purchaser for the full amount paid by him; provided, that no action shall be brought for the recovery of the purchase price after two years from the date of such sale or contract for sale; * * * ". Sec. 82-1-25, Revised Statutes of Utah, 1933.

There is no merit in the contention that DeLamar may avoid under the State Securities Act of Utah the exchange of the lease for the stock.

**(3)** *No issue tendered of failure of Centennial to qualify to do business in Utah under its corporation law.*

Appellant attempts to contend in this appeal that the transfer of the lease to Centennial is void because the transfer was made in the State of Utah without the performance of certain acts required by the Utah constitution and laws which would qualify the Centennial, a Nevada corporation, to do business in Utah. This cause of action for avoidance of the transfer of the lease was not pleaded. No findings were made by the court concerning it. There was no motion before or after the trial, and none here, to amend the bill to tender the issue on such a cause of action to the defendants.

We hold that there is no error in the failure to consider or to find upon such an unpleaded issue; that it is not for our consideration here.

**(4)** *Transfer of lease not voidable because of common directors of Centennial and DeLamar.*

Appellant also seeks to avoid the lease because in the subsequently formed Centennial there were two directors also directors of DeLamar. It cites Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 599, 41 S.Ct. 209, 65 L.Ed. 425, to support its contention.

The transfer of the lease which is sought to be avoided was made under the agreement between DeLamar and four persons, none of whom is shown to have been connected in any way with the management of DeLamar. The record does not show that the contract was not made at arm's length, or that there was any improper advantage taken of DeLamar in its negotiation. The consideration to be given by the Mackay group included a payment of $10,000 into the funds of a corporation to be thereafter created for the ownership and development of the lease. Five Hundred dollars was paid DeLamar upon the execution of the contract. A further consideration was an agreement to erect a mill to serve the property.

The record does not show that in the then undeveloped condition of the leased property, the consideration agreed to be paid was inadequate or that there was anything unfair to DeLamar in the transaction by which it transferred the lease in consideration of some 548,000 shares in Centennial, having the combined assets of the lease and the moneys agreed to be paid for the development of the property. Incidentally, the evidence fails to show any such total failure of performance as would warrant a rescission of the contract.

Incidental to the agreement of transfer was the subsequent creation of Centennial for the development and operation of the property. Not until Centennial was created did the two corporations have any common directors. Obviously, they had nothing to do as such with DeLamar's making of the contract pursuant to which the lease was transferred. There is no error in the decree in refusing to cancel the transfer of the lease because of the subsequent common directorship.

Decree affirmed.