## WALL & BEAVER STREET CORPORATION v. MUNSON LINE, Inc.

### No. 1954.

District Court, D. Maryland.

Nov. 6, 1944.

Douglas H. Gordon, of Baltimore, Md., for plaintiff.

R. Dorsey Watkins and Piper, Watkins & Avirett, all of Baltimore, Md., for defendant.

CHESNUT, District Judge.

By the amended complaint in this case certain *junior* preferred stockholders of Munson Line, Inc., a Maryland corporation, seek to obtain a liquidation of the corporation or, in the alternative, at least the appointment of a receiver for it, on the alleged ground of fraudulent mismanagement of the affairs of the corporation by its president, Harry O. King. The original complaint was filed on May 10, 1943, but a motion to dismiss was granted with leave to amend. The nature of the original

complaint and the basis for the order of dismissal were explained in, D.C., 58 F. Supp. 101.

The amended complaint was filed October 12, 1943. A motion to dismiss this was overruled. In due course the answer of the defendant was filed and much testimony was taken by depositions, some of which only were offered in evidence at the trial of the case because the principal witnesses testified in person. After an extended hearing and argument occupying about five days, the case has now been submitted for final disposition.

The original complaint prayed a liquidation of the corporation or, in the alternative, a distribution to the plaintiffs of the proportionate share of the assets of the corporation applicable to their stockholdings. The amended complaint differs from the original complaint principally in the abandonment of the prayer for partial liquidation and the substitution therefor of a prayer for the appointment of a receiver. My conclusion on the whole case is that the bill must be dismissed, both on the applicable law and the merits of the case. I will state the reasons for this conclusion as briefly as possible in view of the full opinion heretofore filed which outlines the nature of the case, the provisions of the charter of the defendant, and the applicable law.

The underlying theory of both the original and amended complaints is that the corporation was primarily formed for the purpose of continuing the shipping business of its reorganized predecessor corporation; that Harry O. King, representing substantial holdings in the first preferred stock of the new corporation (Class A), formed the plan of discontinuing the shipping business and investing the proceeds thereof, together with other liquid assets of the corporation, in a general investment or holding company business, for the primary purpose of having himself elected president and paying to himself a large salary greatly in excess of the reasonable value of services rendered, to the wastage and spoliation of the assets of the corporation, and generally in fraud of its stockholders. The principal facts established by the evidence follow. I state them as findings of fact.

1. Prior to 1938 the Munson Steamship Company had been engaged for some years in conducting an active shipping business with the ownership of a number of ships, and enjoyed the good will of many shippers. The active head of the business was Carlos W. Munson. Over a period of some years prior to 1938 the corporation had been financially unsuccessful and the loss in the business was about $10,000,-000. It was reorganized under section 77B of the Bankruptcy Statute, 11 U.S.C.A. § 207, in the United States District Court for the Southern District of New York (District Judge Coxe). As a result of this reorganization proceeding the present Maryland corporation was formed and its charter filed and approved by the Maryland authorities on February 4, 1939. Its charter or certificate of incorporation was in usual form authorized by the Maryland statutes relating to business corporations. See Maryland Code of 1939, Art. 23, §§ 1–27. The corporate purposes, objects and powers were stated in Article Third of the Charter. These included the conduct of the shipping business and also separately in subsections 9, 10 and 11, express and very broad powers to deal in real estate and personal property of every kind; to purchase stocks, bonds and other securities of other corporations or interests in other businesses and to own and hold them for investment or deal in them. And by subsection 18 the corporation was authorized to do everything necessary, proper, advisable or convenient for the accomplishment of *any* of the purposes or the attainment of any of the objects, or the furtherance of any of the powers set forth, and do every other act or thing incidental thereto or connected therewith; and also it was expressly therein provided that the enumertion of the various powers "shall be regarded as independent objects, purposes and powers" and the enumeration of specific objects, purposes and powers was not to be considered to limit or restrict in any manner the attainment of the objects, nor was the expression of one thing to be deemed to exclude any not expressed, although it be of like nature.

Article Fifth of the Charter authorized the issuance of capital stock in the amount of 180,000 shares all without par value, consisting of 18,000 shares of preferred stock Class A; 2,000 shares of preferred stock Class B; 80,000 shares of preferred stock Class C, and 80,000 shares of common stock. There followed lengthy and rather complex specifications of the preferences as to dividends and capital distribu-

tion of the respective classes of stock. Those that are specially important in this case are that the Class A stock should be entitled to a preferential dividend at the rate of $4 per share per annum, payable quarterly on the first days of March, June, September and December in each year and to be noncumulative until February 28, 1941; and on liquidation the Class A stock was to be entitled to only $25 per share; but there was a special provision in Article 5(6) that "so long as any shares of preferred stock Class A shall be outstanding the corporation shall not redeem or purchase any of its preferred stock Class C or common stock unless the book value of the assets of the corporation (applicable to its stock) computed in accordance with accepted accounting principles, remaining after such redemption or purchase, shall be at least equal to $1,000,000. So long as any shares of preferred stock Class B shall be outstanding the corporation shall not redeem or purchase any shares of its preferred Class C or common stock."

It is also importantly to be noted that Article 5(9) "further provided, that so long as 5,000 shares or more of the preferred stock Class A are outstanding, dissolution of the corporation shall not be authorized without the affirmative vote of the holders of a majority of the shares of preferred stock Class A outstanding and entitled to vote thereon." Subject to the preferences of the Class A stock as to dividends, the Class B and Class C preferred stock were respectively likewise entitled to preferential dividends of $4 per share per annum.

2. Pursuant to the plan of reorganization the District Judge approved the nomination and appointment of nine (9) directors for the new company. They included Carlos W. Munson, H. O. King, and Louis A. Green (the latter a partner of Stryker & Brown to be hereinafter mentioned). At the time of the reorganization the corporation owned five old ships, two of which were in such bad state of repair that they were promptly sold. The remaining three ships were repaired at a cost of $58,200, and were put into operation. Their operation resulted in a period of about nine months in a loss of over $80,000. In addition to the ships the corporation had more or less liquid assets worth about $1,500,000. Mr. Munson proposed an extensive program of continuing and extending the shipping business. Other directors were very doubtful as to the financial wisdom of this course under the shipping conditions then existing in 1939. Mr. Munson then retired from the Company and formed a new corporation taking with him a large number of the operating personnel of the Maryland corporation. In view of this situation the directors authorized, and the stockholders later ratified, an operating contract with Mr. Munson regarding the three ships under which the loss above mentioned was incurred.

3. In view of the existing business situation the Board of Directors of the corporation under date of November 10, 1939, called a special meeting of the stockholders to consider fundamental conditions affecting the corporation. This meeting was called to be held November 28, 1939. A lengthy report was sent to the stockholders which I find fairly and correctly summarized the conditions affecting the corporation at that time. The directors recommended to the stockholders that the extension of the shipping business as proposed by Mr. Munson should be disapproved and stated "at such said meeting of stockholders action will be requested by the stockholders for the investment of the funds of the Company and its future business activity as referred to herein and in the notice of meeting annexed herewith". The Board also recommended that it would be advisable to dispose of the three remaining ships by the Company at a satisfactory price. The letter to the stockholders pointed out that the alternatives were "either to liquidate the Company and distribute the assets to the stockholders, or to engage the funds of the corporation in some manner". It also pointed out that under the charter the corporation could not be liquidated so long as 5,000 shares of preferred stock Class A were outstanding, and that the directors had been advised by the holders in excess of 50% of the then outstanding 16,042 shares of Class A stock that they were opposed to liquidation. The only alternative was the engagement of the funds of the Company in some manner. It was pointed out that the investment of the funds in high-grade investment securities would not produce sufficient income to pay dividends on the Class A stock and leave anything for the junior preferred stocks, and that the holders of a majority of the Class A stock desired that a substantial portion of the funds of the Company be invested at the discretion of the directors "in what might be called special situations where capital appreciation with

a substantial return is possible and that the balance be invesed in income-producing securities of an investment character". The term "special situations" was explained as follows: "It is contemplated that this term would include the investment of funds in the securities of corporations in the process of reorganization, whether voluntary or involuntary, including reorganizations through equity receiverships, bankruptcy and reorganization proceedings; the investment of funds in securities of corporations which have defaulted in payment of interest or dividends thereon; the financing and development of small companies," etc. In the latter connection the letter to the stockholders specially referred to and quoted the terms of the charter, Art. 3, subsections 9, 10 and 11, above referred to. A balance sheet of the corporation as of September 30, 1939, and other financial data affecting the corporation was annexed to the letter to the stockholders. It showed assets valued at $1,790,183.70, including the vessels owned at $270,710.25. It showed liabilities other than capital stock in the amount of about $350,000, and surplus of $834,870.28.

4. On November 27, 1939, a day before the scheduled stockholders meeting, some of the stockholders presented a petition to District Judge Coxe to enjoin the stockholders from approving the investment of surplus funds of the corporation in other than the shipping business. This motion was denied by Judge Coxe without opinion.

5. At the stockholders meeting of November 28, 1939 the Chairman announced there were present in person or by proxy the majority of shares issued and entitled to vote, to wit, 89.794 shares out of a total of (about) 145,000 shares. A large majority of the stock represented, about 77,000 shares, voted against Mr. Munson's proposal for an expanded shipping program, and also voted in favor of the investment of the funds of the corporation in special situations, and that the corporation in that respect exercise its charter powers under Art. 3, §§ 9, 10 and 11. About 13,000 shares were voted in opposition. Counsel for the plaintiffs contend that the affirmative vote did not amount to a majority of all the stock entitled to vote because, in addition to the 145,000 shares actually issued, there were about 20,000 shares authorized to be issued which were being held for the holders of interests in the old corporation who had not turned in their securities for exchange, and thus had not received any notice of the meeting. The total authorized issue including these latter would have been 165,357. I find no legal merit in this contention.

6. Shortly before this meeting Mr. Munson had resigned as president of the Company and Harry O. King was elected to succeed him. At the time of the stockholders meeting Mr. King had bought the stock (some Class A and some Class C and common) of two very large stockholders, Messrs. Stewart and Green, who were also directors. He thus became the holder or representative of a majority of the then outstanding Class A stock, but did not then own or control the majority of the voting stock.

7. Before the stockholders meeting, and after it, some of the original nine directors resigned and on April 16, 1940, at a stockholders meeting the number of the Directors was reduced from nine to five. An Executive Committee of three members, including Mr. King, was constituted. The new Executive Committee and the new Board of five Directors were doubtless friendly to Mr. King. About the same time the three remaining ships were sold by authority, or with the subsequent approval, of the Board of Directors, producing in cash about $400,000. The Executive Committee with the approval of the Board of Directors, early in 1940 voted a salary of about $10,000 to Mr. King for his services in 1939, and a salary of $18,000 a year for 1940. Some time later, effective for 1941, 1942 and 1943, Mr. King was also voted an additional sum of $6,000 in lieu of submitting itemized vouchers for actual expenses. King has remained as president of the corporation until the present time, with a salary of $18,000 a year, the $6,000 nonvoucher expense account being discontinued beginning with 1944.

8. The corporation has conducted no shipping business since early in 1940. Since then its funds have been invested in miscellaneous securities of other corporations, and from time to time these have been sold and the proceeds reinvested. The net result of the separate investments and sales are itemized in Defendant's Ex. No. 2, which shows that there has been a net gain realized on investments sold in the capital amount of about $130,000, and the income thereon was an additional sum of about $65,000. The Exhibit also shows

that there has been a net gain on securities purchased but not sold, based on market prices as of September 30, 1944, in the amount of $1,496,214. Nearly all of the securities bought and subsequently sold show a profit, with losses in a few instances.

In 1941 the corporation bought a majority stock interest in the Brockway Motor Company, a New York corporation, which manufactures motor trucks. The purchase price per share was about $9. The cost of this investment was $1,044,046. This corporation had an extensive plant in New York State and was a large manufacturer of motor trucks. It had been quite successful until a few years ago when large credits on sales to South American purchasers resulted in a heavy loss, in consequence of which the Company had to be reorganized and most of its stock was distributed to banking creditors whose nominees largely constituted the Board of Directors. Mr. King carefully investigated this Company before buying for the defendant corporation the majority of its stock. The Board of Directors was not changed, but Mr. King was added as a member. He took an active part in the management of the Brockway Motors, becoming Chairman of its Executive Committee, and, on the recommendation of the operating president, a Mr. Piroumoff, the Board voted him a salary of $24,000 a year which he has been receiving since that time. The present current market price of the Brockway Motors is between $12 and $13 per share. At $12.25 per share the appreciation in market value, if now realized on the particular investment, would be $382,124. In addition thereto it may be noted that the evidence in this case shows that the present liquidating value of the stock of the Brockway Motors Company, based on its present net quick assets, would be in excess of $20 per share. If so realized, the Munson Line holdings in Brockway would be further increased in value by about $800,000.

9. The defendant corporation has also acquired a practical control of the first and second preferred and common stocks of Huylers, a candy manufacturing and selling corporation, at a total cost of $116,615. At present market prices for the Huylers stock the investment shows a capital appreciation of over half a million dollars. These two investments, the Brockway Motors and Huylers, are particularly illustrative of the type of investments heretofore referred to as "special situations". Huylers had also recently been reorganized and its affairs were carefully investigated and studied by King before purchase was made. It is these two investments which are particularly criticized as "wild and speculative" investments made on the initiative or direction of Mr. King. As of September 30, 1944, Munson Line has received dividends on its Brockway stock in the amount of $333,167.88; and on Huylers' stock in the amount of $54,598. In summary (see Defendant's Ex. No. 3), the defendant contends that the result of its investment policy for the period 1940-1944, is that, on an original capital of $1,535,000, profits have been realized after all expenses in the amount of $350,429.81, and that there is an additional appreciation in market value of securities in the amount of over $1,000,000, to which should fairly be included an additional sum of $800,000 based on the present liquidating value of the Brockway Motor stock, or, in the aggregate, a total gain to the Munson Line, Inc., of over $2,000,000. On this basis the fair value of the net assets of the defendant is about $3,500,000. The evidence in the case fairly supports this contention on the basis of present market prices, and on the assumption that the holdings of the defendant in Brockway and Huylers could be liquidated at such prices. The defendant corporation has paid in dividends on its stock $266,411 (as of May 31, 1944).

10. I find no fraud or corporate mismanagment of the defendant, either intentional or negligent, by King or the other officers and directors of the corporation. On the contrary I find that they have all acted in good faith throughout.

11. The plaintiffs in the original and amended bills are three stockholders of the defendant corporation. At the beginning of the trial one of the plaintiffs, Wall & Beaver Street Corporation, dismissed the suit on its part. The remaining plaintiffs are Strauss Brothers, and Hortense I. Braunschweiger. The latter is not personally a beneficial owner of the stock but merely a nominee for Stryker & Brown who purchased the stock, or relatives of that firm to whom the stock has beneficially been transferred. Strauss Brothers, for joint account of themselves and another firm of security dealers, own or hold 2.021 shares of the C preferred stock, and the same amount of common stock. Braunschweiger is the nominal holder of 1,580 shares of C preferred stock and an equal

amount of common, and also 146 shares of the A preferred stock. All the Braunschweiger stock and a majority of that held by Strauss Brothers was purchased by them respectively subsequent to the stockholders meeting of November 28, 1939. Louis Green, heretofore mentioned as one of the original directors of the Munson Line, is an active partner of Stryker & Brown. Before the stockholders meeting he sold his stock to King. At the stockholders meeting he voted against Mr. Munson's proposition to greatly expand the shipping business, and voted in favor of the corporation exercising the charter powers in Art. 3, §§ 9, 10 and 11, and for investment of funds in "special situations". At the meeting Strauss Brothers voted the stock held then by them against the investment in "special situations". Both Strauss Brothers and Stryker & Brown continued to buy stock of the corporation after the stockholders meeting. In October 1944 Braunschweiger for Stryker & Brown purchased 500 shares of the stock. The stock now held by Strauss Brothers was acquired by them at a purchase price of $3 per share or less. King has offered to buy their stock at that price but they have refused to sell. If the defendant corporation could now be liquidated it is estimated that the holders of the C preferred stock would receive about $16 or more per share for their stock.

12. The defendant corporation is amply solvent.

The principal contention of the plaintiffs in support of their prayer for liquidation of the corporation is based on the doctrine of the common law that, in the absence of statutory authority, neither the directors nor the majority stockholders of a solvent and prosperous corporation may validly sell all of the property of the company and thereby abandon the enterprise for which it was organized. Geddes v. Anaconda Copper Mining Co. et al., 254 U. S. 590, 595, 596, 41 S.Ct. 209, 65 L.Ed. 425. The Maryland common law is apparently similar. Stokes v. Detrick, 75 Md. 256, 263, 23 A. 846. But, as stated in the Geddes case, supra [254 U.S. 590, 41 S.Ct. 211 65 L.Ed. 425], there is a well established exception to the rule, namely, "that when, from any cause, the business of a corporation, not charged with duties to the public, has proved so unprofitable that there is no reasonable prospect of conducting the business in the future without loss * * *

the owners of a majority of the capital stock, in their judgment and discretion exercised in good faith, may authorize the sale of all the property of the company for an adequate consideration, and distribute among the stockholders what remains of the proceeds after the payment of its debts, even over the objection of the owners of the minority of such stock." In many States this subject is regulated by statute. In Maryland the statute is Maryland Code of 1939, Art. 23, § 38. It requires a two-thirds vote by each class of stock to authorize such a sale, with appraisal and payment to dissenting stockholders of the fair value of their stock. In re May Oil Burner Corp., D.C.Md., 38 F.Supp. 516, 519. It is not contended that the conditions imposed by the Maryland statute have been met in this case, but the common law rule referred to is not applicable here for several reasons. The sale of the three ships was not a sale of all or anything like all, but only of a small precentage, of the assets of the corporation. And the business transacted by the ships was not prosperous but for over a year had shown a large loss, and it was the judgment of the Directors, and subsequently of a large majority of the stockholders at a stockholders meeting, that the shipping business should not be expanded but that the major assets of the corporation should be otherwise invested; and furthermore the charter in this case expressly provides that there shall be no liquidation of the corporation without the consent of a majority of the A stock so long as 5,000 shares thereof are outstanding (which is the present case) ; and there has been no such consent by the A stockholders.

The plaintiffs' contention is that the sale of the ships and the at least temporary abandonment of the shipping business was *ultra vires* and that fact, plus the alleged mismanagement of the corporation by King, warrants the court in liquidating the corporation despite the charter provision to the contrary. But I find no mismanagement of the defendant corporation. The sale of the ships was authorized or ratified by the directors and was an exercise of reasonable judgment on their part to stop further losses in the business. The investment of the proceeds of sale and other assets in stocks and securities of other corporations was expressly authorized by the charter powers and purposes and was approved by a large majority of the stock-

holders at the meeting called to consider that very subject. Counsel for the plaintiffs argue that the provisions of the charter for investment should be construed as merely incidental to the powers and purposes to conduct a shipping business. No judicial authority is cited for this construction and Judge Coxe apparently did not so construe the charter. I think it quite clear from the charter as a whole (and is commonly understood in Maryland corporation practice) that the powers for investment referred to are to be construed as separate and independent powers and not merely in aid of other powers stated in the charter.

There is no warrant in this case for the interposition of a court of equity to appoint a receiver for this corporation or to order its liquidation or otherwise interfere in its internal management. The Company is amply solvent and its business has apparently been very profitably conducted. It is not now asserted by counsel for the plaintiffs that the large investment in the Brockway Motors or in Huylers has been improvident in result even though it may have initially been speculative in character. Indeed the present complaint is not so much that there was mismanagement in making investments as that there will be mismanagement in continuing to hold them. As to this the court is not called upon to make a decision as it is a matter of judgment and policy in the internal management of the corporation.

It is a well established doctrine that a court of equity will not interfere in the internal management of a solvent corporation unless there is clear evidence of fraud, spoliation or imminent danger of loss of the corporation's property, or of some unlawful act. McQuillen v. National Cash Register Co., 4 Cir., 112 F.2d 877, 883; Eisler v. Eastern States Corporation, 182 Md. 329, 35 A.2d 118; Surgical Instrument Co. v. Requardt, 180 Md. 245, 23 A.2d 697; Powers Foundry Co. v. Miller, 166 Md. 590, 171 A. 842; Williams v. Salisbury Ice Co., 176 Md. 13, 3 A.2d 507; Fletcher, Cyc.Corp. Vol. XIII, § 5821.

Counsel for the plaintiffs emphasizes the legal proposition that the modern judicial law affecting corporations authorizes a court of equity to liquidate even a solvent and going corporation where the management in control by authority of the majority of the voting stock is fraudulently oppressing and prejudicing the value of the minority stock. Great reliance is placed on the Tower-Hill Cases in this Circuit, Tower Hill-Connellsville Coke Co. v. Piedmont Coal Co., 33 F.2d 703; Id., 64 F.2d 817, 91 A.L.R. 648, and on the Maryland case of Hagerstown Furniture Company v. Baker, 155 Md. 549, 142 A. 885. The Tower-Hill Cases were referred to at some length in the earlier opinion in this case, and what was there said need not be here repeated. But the facts of those cases and the Hagerstown Furniture Company case are utterly different from the facts of the present case, and furnish no fair analogy for the principle to be applied. In this case, unlike the Tower Hill Cases, the two complaining stockholders (of very many who have not joined with them in this suit) are holders of only a comparatively small amount of the very junior C preferred stock. The evidence does not show that the C stock has been depreciated in value by any corporate act of the defendant or its majority stockholders; nor is it shown that the C stockholders have been deprived of any dividends from profits to which they should properly have been entitled. On the contrary, the value of their stock seems to have been enhanced rather than diminished by the corporate management. What they are seeking here is a large profit over and above the cost to them of their stock at market prices by the liquidation of the corporation contrary to the express provisions of its charter protecting the senior A stock. It was the duty of the management to apply the net profits of the corporation preferentially to the payment of the dividends on the A stock because that is a preference stated in the charter. The fact that King holds or represents a majority of this Class A stock is legally immaterial so long as the management complies with the charter requirements as to preferential dividends. The right thereto exists in favor of all the holders of Class A stock and it would be contrary to the rights of the minority holders of this class of stock to liquidate the corporation against their will and their rights under the charter, with the ultimate result of loss to them and profit to the plaintiffs, in the amount of about five hundred per cent. on their investment.

Apart from the sale of the ships and the present investment policy of the corporation, the only substantial point set up by the plaintiffs for the appointment of a receiver is the alleged excessive salary paid to King by authority of the Board of Directors. The contention is that the sala-

ry is so excessive that it amounts to practical spoliation and that it is not the independent judgment of the Directors but really the action of King himself in merely purported reliance upon a subservient and dependent Board of Directors whose election has been caused by King as the holder in person or by proxy of a majority voting power of the corporation. The present Board of five directors consists of King, Ryder, the Treasurer of the corporation, Ferguson, a step-son of King, Swart, president of Huylers, and John Griswold. The evidence does not show that these directors are mere nominees or dummy directors. On the contrary, Ferguson, Swart and Griswold, according to the evidence, are men of substantial affairs and competence. There is no evidence in the case sufficient to show that they are mere dummy directors as contended for by the plaintiffs; nor does it appear that they are not exercising their independent judgment as to the reasonable amount of salary paid to King; nor is the amount of the salary intrinsically sufficiently excessive to warrant the appointment of a receiver on that account. In McQuillen v. National Cash Register Co. 4 Cir., 112 F.2d 877, 884, certiorari denied 311 U.S. 695, 61 S.Ct. 140, 85 L.Ed. 450, it was said by Judge Dobie:

"In situations of this kind, the courts must distinguish between compensation which is merely excessive and is thus lawful, and compensation which is actually wasteful and is thus unlawful. Courts cannot here condone on the part of those in control of a corporation either actual bad faith or a total neglect or even utter indifference to the rights of stockholders. Necessarily, much must be entrusted to the discretion of corporate directors and courts should intervene here if, and only if, there has been so clear an abuse of this discretion as to amount legally to waste."

The principle stated is the same, although the facts were quite different, in Wight v. Heublein, 4 Cir., 238 F. 321, and Matthews v. Headley Chocolate Co., 130 Md. 523, 100 A. 645. See also Fletcher, Cyc.Corp. vol. V, §§ 2122, 2133, 2171.

On the plaintiffs' evidence, and until hearing the testimony of Mr. King, I was inclined to think that the salary of $18,000 per annum paid to King, in view of his separate compensation of $24,000 per annum from the Brockway Motor Company, was unreasonably large; but after considering his testimony and all the evidence in the case, I have concluded that it is not so excessive that a court of equity would be warranted in interfering with the judgment of the directors. It is not so large as to constitute waste and therefore unlawful. The salary paid to King as Chairman of the Executive Committee of Brockway Motor Company is only indirectly here involved. I find no just criticism of the amount of that salary. The Brockway Motor Company in 1943 had had an annual gross business of $12,133,561.88 with a net profit of $362,608.93, after taxes amounting to $1,305,500. King estimates the gross for 1944 will be $18,000,000 or more with net profit after taxes of $400,000. Its president, one Piroumoff, is paid a salary of about $70,000. It appears that King's salary of $24,000 per year was voluntarily and freely voted by a competent and independent Board of Directors. I do not find any evidence in the case that the purchase of the Brockway stock was made by the Munson Line for the purpose of securing an aditional salary to King. Nor is there any reasonable basis for the inference that King or the directors of the defendant corporation will continue to hold the Brockway stock against their best judgment of its continued value to the corporation, merely to perpetuate King's salary from Brockway, as the King family personally holds a very substantial amount of the Brockway stock, in addition to that held by the corporation; and the King family also now owns about one-half of all the stocks of the defendant, and would thus largely lose in their capital investment if the Brockway stock declines greatly in value.

Plaintiffs argue that the entire business of the corporation is now limited to that of which they call an investment trust and that the maximum charge of the management of such a trust should be not more than one-half of one per cent. of the capital value of the investment managed. During the years 1940 to 1943, inclusive, the capital value of the corporation's investments was about $2,000,000. One-half of one per cent. of this is $10,000, compared with King's salary of $18,000. Even on this basis it is doubtful that the court would be justified in interfering by substituting its judgment for that of the directors of the corporation. But King's testimony shows that his services to the corporation during this period went far beyond that of the management of an investment trust. In the early years, as ap-

pears from the report to the stockholders, dated November 10, 1939, there was much more for the management of the corporation to do than mere seeking of investments. Nor were the investments when made merely the purchase of approved and good securities tested by the usual analysis of market figures. The policy of making investments in "special situations" required extensive and intensive study of prospective business bargains brought to King's attention from time to time. Many prospects were rejected in comparison to those accepted. The additional compensation of $6,000 a year for expenses, I am satisfied from the evidence, was largely expended by King in extensive travelling to investigate and report on prospects brought to his attention. Up to the present at least, his judgment in these investments actually made by the corporation has resulted in very substantial present or prospective profits. King's total salary and fixed expenses allowance for five years and eight months to September 3, 1944, totalled $113,500. · Realized profits including income on investments have been $350,429.81 (see Defendant's Ex. No. 3). In addition there has been an apparent large capital appreciation of market value in the Brockway Motors and Huylers situations amounting to over $1,000,000. Even if King's salary from Brockway is included, his average compensation has been about $33,000 per year. Mr. King is 54 years of age and his testimony shows that he has had wide experience in varied business enterprises either for himself or as manager for others. He has received salaries of $25,000 or more a year from other enterprises. Up to a few years ago he had accumulated a fortune of approximately $1,000,000, most of which was lost in an unfortunate real estate venture. Plaintiffs' counsel emphasizes this as characteristic of King's alleged speculative tendencies. But the evidence as a whole does not warrant the conclusion.

The court is not called upon in a case of this kind to substitute its own judgment for that of the directors of the corporation as to what would be a reasonable salary for Mr. King either in the past or in the future. In holding that the salary is not sufficiently large to justify the appointment of a receiver, it is not to be implied therefrom that the court's independent judgment would approve the salary presently received by King as proper in amount. The principal present activity of the de-fendant corporation would seem to be limited to the care and attention that should be given to its investments, particularly to the Brockway Motor Company and Huylers. Mr. King is receiving a very substantial compensation directly from the Brockway Motor Company for attention to its affairs. Mr. Swart, a director of the Munson Line, is receiving a salary of about $20,000 from Huylers, which does a gross business of about $8,000,000 a year. The capital value of the remaining security investments of the defendant corporation is only about $100,000 in eight other corporations. In these circumstances it may be appropriate for the Board of Directors of the Munson Line to give renewed consideration to the question whether there should now fairly be some reduction in the $18,000 salary paid to King; but the amount, if unreasonably large, is not so excessive that it warrants the intervention of the court in the internal management of the corporation.

The evidence in the case is quite voluminous. As the plaintiffs' case emphasized charges of fraudulent mismanagement of the corporation it was deemed proper at the trial to liberally allow a wide scope to the plaintiffs' evidence. Now in retrospect, viewing the case as a whole, much of the plaintiffs' evidence seems to have been irrelevant or unimportant. The active management of the corporation for the past five years has been in King's hands. Although not a party to this case, he voluntarily testified as a witness and was thoroughly examined and cross-examined for about five hours. (The plaintiffs' suit against him and the Munson Line, Inc., was dismissed for want of venue jurisdiction by the United States Court of Appeals for the District of Columbia, October 16, 1944.) I was impressed by the directness and candor of his testimony and with his apparent exact and detailed acquaintance with the affairs of the corporation and the care that he had given in selecting its investments. The effect of much of the plaintiffs' evidence possibly tending to throw suspicion on the good faith and competence of King, was dispelled by his own testimony.

It is unnecessary to review in detail all the circumstances stressed by plaintiffs' counsel as tending to show mismanagement. Certain loans made by the corporation were criticized as having been made on insufficient security. The evidence does not

show that the loans were improvident and they have all been re-paid with interest; nor were they in large amounts.

Complaint is also made that dividends on the Brockway stock were withheld until after the annual stockholders meeting, with the result that there was at the time of the stockholders meeting a temporary default in the payment of the required dividends on the Class A stock, thus bringing into operation the voting of the stock by classes and limiting the number of directors to be chosen by the Class C preferred stockholders to two out of the five. However, this was explained by showing that the dates for the periodic dividend payments on the Class A stock as fixed by the charter occurred at a time prior to the payment of dividends by Brockway. At the present time there is no default in dividends on the Class A or Class B preferred stocks. And recently a small dividend has been paid on the Class C preferred stock. It therefore appears that if the stockholders wish it, they can call a special stockholders meeting to remove any of the present directors and to elect new ones in their place. Under the Maryland statute, Maryland Code of 1939, Art. 23, §§ 18 and 19, a special meeting of the stockholders can be called by the president or by a majority of the Board of Directors upon ten days' written or printed notice and by a majority vote the directors may be removed and new directors substituted. If the president or directors refuse to call such a special meeting, it may be called by the majority stockholders. The plaintiffs have not endeavored to have a special meeting called and they say that it will be futile to make the attempt because the Board of Directors are friendly to King and the latter, with members of his family, now holds the majority of both Class A and Class C stocks. However, I understood Mr. King in his testimony to say that he would be willing to call a special stockholders meeting for proper corporate purposes. It is also to be noted that Art. V(8) of the charter makes special provisions with respect to the shifting of the voting power of the several classes of stock. Among the provisions is one that, when there is no default in payment of dividends on the A stock (which is now the case) but there is a default in any quarterly dividend payable on the preferred stock, Class B (which is not now the case) or on the preferred stock Class C (which is now the case), the holders of the preferred stock Class B and preferred

stock Class C voting together as one class, shall be entitled to elect 60% of the Board of Directors, and the holders of Class A, and common stock, voting together as one class, shall be entitled to elect the remaining members of the Board of Directors. From this it appears that at the present time at a special stockholders meeting the holders of a majority of Class B and Class C stocks voting together, could validly elect a majority of the Board of Directors. The charter further provides:

"Upon any change of voting rights, as above provided, the terms of office of all directors then in office shall cease and terminate upon the election of new directors at a meeting of the holders of the classes of stock of the Corporation then entitled to vote for directors, which meeting may be held at any time after such change of voting rights, upon notice similar to that provided in the By-Laws for a special meeting, and shall be called by the President of the Corporation upon written request of two members of the Board of Directors or of the holders of record of shares entitled to 10% of the aggregate number of votes entitled to be cast by the holders of all the shares outstanding of any voting class entitled to elect a majority of the members of the Board of Directors. In default of the calling of such meeting by the President within five days after the making of such request, such meeting may be called by any holder of record of any such class of stock. At every such meeting, the presence in person or by proxy of stockholders entitled to cast one-third of the aggregate number of votes entitled to be cast by the holders of all of the shares, outstanding and entitled to vote thereat, of any voting class entitled to elect a majority of the members of the Board of Directors shall constitute a quorum."

It appears that the King family now owns a majority of each of the three classes of preferred stock, A, B and C, but that during the years 1940 to the middle of 1943 or even later, they did not hold a majority of either the B or C stock. As the dividends on the A stock have currently all been paid up some time during each year, it would appear that the holders of a majority of the B and C stocks, if they had desired to do so, could have called a special stockholders meeting and elected a majority of the Board of Directors who, in turn, could have deposed King as president or curtailed his salary. And I take

120

it they could also by a majority vote of stockholders have changed the business policy of the corporation and could have resumed the shipping business. In the former opinion in this case it was pointed out that it was alleged that the three stockholders then constituting the plaintiffs held 15% of the stock of the corporation. Now that Wall & Beaver Street Corporation has retired from the case as a plaintiff, it appears that the remaining plaintiffs hold only about 5% of the stock. But in any event it does not appear that the plaintiffs have sufficiently endeavored to exhaust their rights through authorized corporate procedure. That is another reason why this equity court should not presently interfere with the internal management of the corporation. Eisler v. Eastern States Corp., 182 Md. 329, 35 A.2d 118, 119.

Plaintiffs also complain that King has been depressing the market value of the C stock by buying it up at a low figure; but the evidence does not show that such purchases have been effected by fraud, misrepresentation or concealment of inside facts. It is perhaps significant that although this suit has been pending for more than a year, no other stockholders of the corporation have intervened to join the plaintiffs in this case.

Finally, it may be noted with respect to that aspect of the complaint which deals with the policy of investments in "special situations", the plaintiffs have a very doubtful standing to maintain the suit at all, because, as to Braunschweiger, all her stock was purchased after the policy was authorized by the stockholders on November 28, 1939, and the same is true as to most of the Strauss stock. Eisler v. Eastern States Corp., supra 35 A.2d page 120; Matthews v. Headley Chocolate Co., 130 Md. 523, 531, 100 A. 645; Federal Rules of Civil Procedure, Rule 23, 28 U.S.C.A. following section 723c; McQuillen v. National Cash Register Co., 4 Cir., 112 .F.2d 877, 882; Perrot v. United States Banking Corp., D.C.Del., 53 F.Supp. 953.

The conclusions of law are:

1. That the evidence does not warrant the liquidation of the defendant corporation or the appointment of a receiver for it, and

2. That the plaintiffs' complaint must be dismissed with taxable court costs to be paid by the plaintiffs.

Counsel may submit the appropriate judgment in due course.