MORSE GENERAL TIRES, Inc., a Corporation, and Sally A. Morse, Executrix of the Estate of Warder A. Morse, Deceased, Plaintiffs,

v.

The GENERAL TIRE & RUBBER COMPANY, a Corporation; S. S. Poor, F. W. Knowlton; Olive Claypool; Joseph H. Benson, and General Tire Service Co., a Corporation, Defendants.

Civ. No. 5858.

United States District Court,
W. D. Oklahoma.

Dec. 30, 1954.

76

McInnis, Cantrell, Thompson & Sullivan, Oklahoma City, Okl., for plaintiff.

Charles Hill Johns, and Cargill & Cargill, Oklahoma City, Okl., for defendant.

WALLACE, District Judge.

Plaintiffs, Morse General Tires, Inc., a corporation, and Sally A. Morse, executrix of the estate of Warder A. Morse, Deceased, bring this action against the defendants to recover the reasonable value of assets of plaintiff corporation allegedly fraudulently disposed of by the defendants.

In substance, plaintiffs allege the following as their bases for recovery: Immediately prior to July 30, 1950, the plaintiff corporation, a Delaware corporation, was managed and controlled by a Board of Directors, consisting of Warder A. Morse (husband of plaintiff Sally A. Morse), now deceased, and defendants S. S. Poor, and F. W. Knowlton. On July 30, 1950, Mr. Morse died leaving the directorate in the hands of Poor and Knowlton. Poor was a vice-president and director of defendant General Tire and Rubber Company (herein referred to as General) and Knowlton was then Assistant General Counsel and Assistant Secretary of defendant General. Plaintiffs urge that Poor and Knowlton while acting in such dual capacity fraudulently concealed from plaintiff, Mrs. Morse, that she personally and as executrix of the estate of Mr. Morse, owned the controlling stock in plaintiff corporation and illegally sold and conveyed all of the assets and business of the plaintiff corporation to a subsidiary of defendant General, without receiving a fair and adequate price for such assets.[1]

A vital issue in the instant case is the status of stock ownership and control of plaintiff corporation at the time of the death of Mr. Morse, July 30, 1950. In order to determine such condition it is helpful to review the business history of the plaintiff company.

In the latter part of 1945 an arrangement was made whereby, with the sanction of General, Warder Morse and one H. A. Eckhard were to go into business together, such business to serve as agent and retail outlet for defendant General in Oklahoma City, Oklahoma. In furtherance of such plan, in January 1946 defendant General and Mr. and Mrs. Eckhard entered into a pre-incorporation agreement whereby the Eckhards agreed to form a corporation known as "Eckhard-Morse General Tires, Inc." with an authorized capital of $40,000. The Eckhards were to transfer to said corporation the assets of their existing business and General was to subscribe and pay for $5,000 of the capital stock. The Eckhards further agreed to sell to General 158 shares (of the total 400 to be issued) for the sum of $15,800 cash. General in turn agreed to reissue 192 shares of its total of 208 to the Morses, retaining 16.

Inasmuch as the Morses were only investing $6,200 from their personal funds and needed an additional $13,000 for their portion of the investment, General

[1] Plaintiffs allege that the true value of all the net assets of Morse General on August 1, 1950, was $140,392.95. They ask for judgment in the amount of $79,-427.55, the difference between the alleged true value of the net assets and the $60,-965.40 paid plaintiff corporation.

agreed to loan the Morses said $13,000, it *being understood* that the 130 shares purchased with General's funds were to be held in General's name until the Morses repaid General and the shares purchased with Morses' funds were to be further collateral security for such indebtedness.[2]

Thus, at the time "Eckhard-Morse General" came into existence General *was in control having the voting rights of 208 of the 400 issued shares.*[3]

In May of 1947 the Eckhards contracted to sell their interest in the plaintiff corporation. 96 shares were sold directly to General with the remaining 96 placed in escrow to be retired by the corporation out of ½ of the company's future net earnings. By October 1, 1949, the 96 shares of Eckhards' stock placed in escrow had been retired. In addition, the Morses had reduced the indebtedness owed General to $8,100, plus interest. As of such date of the 304 issued shares, 111 stood in Morses' name and 193 stood in the name of General.

On July 24, 1950, Mr. Morse mailed his check for $10,756.19 to General and requested that such funds be applied to purchase the 96 shares of stock held in General's name which General had purchased at a cost of $9,156.19 from the Eckhards at the time the Eckhards sold their interest in the company and also asked to buy the 16 shares purchased by General for $1,600 at the time of incorporation. The day after this check was mailed Mr. Morse was stricken with a heart attack and passed away on July 30th.

General refused to retire all 96 shares of stock requested by Mr. Morse, not wishing to relinquish control of the corporation while said corporation was indebted to General, but did sell 65 shares of the 96 for $6,199.31, and sold the 16 for $1,600, placing the remaining $2,956.68 of the check mailed by Mr. Morse in a special account to the credit of plaintiff corporation.[4]

Plaintiffs single out General's refusal to sell all 96 shares as the first

2. The agreement between Morse and General on November 14, 1945 (DX–2) provided in part: "* * * (2) Morse shall evidence such loan by his demand promissory note in the same amount, bearing interest at six per cent (6%) per annum. Stock purchased with such funds shall be issued in the name of and be held by General as collateral for such loan. Morse shall also pledge with General as further collateral security such shares as are paid for with funds of Morse."

3. General had the 16 shares it had purchased and held 130 more shares in its name for the purchase of which it had loaned to Morse the purchase money, and also had the voting rights to the remaining 62 shares purchased by Morse but held by General for collateral.

As written by Knowlton to Felix (Morse's counsel) (DX–7) on January 11, 1946: "As I explained to you, our arrangement with Mr. Morse was that all of the stock for which we furnished financing to him is to be issued in our name, Mr. Morse, himself, is furnishing financing to the extent of $6,200.00. In order to avoid rewriting the Pre-Incorporation Agreement, we have in mind that immediately after issuance of the two certificates for 96 shares each to Mr. Morse and his wife, they will individually endorse 65 of the 96 shares each to us and the corporation re-issue corresponding certificates in the name of The General Tire & Rubber Company. These certificates are to be forwarded in to us as well as all certificates which are in the name of Mr. Morse and his wife, the latter endorsed in blank."

4. A memorandum from Claypool to Little on July 28, 1950 (both of General) (PX 10–B) indicates how the $10,756.19 was applied: "We are attaching check in the amount of $10,756.19, received from Morse General Tires, Inc., for the retirement of certain of our stock which we own in Morse General Tires, Inc. $1,-600.00 of this represents the purchase of 16 shares which we own at a value of $100.00 per share. The balance was intended for the purchase of the 96 shares at $9,156.19, however, if the entire 96 were retired, Sally and Ward Morse would be the majority stockholders. Therefore, we would like to retire 65 shares of the 96 at an approximate figure of $95.374 per share—or $6,199.-31—and the balance of $2,956.68 to be credited to Morse General Tires, Inc., in a special account, which is the amount due on the remaining 31 shares."

illegal act which paved the way for the ultimate fraud allegedly worked on plaintiffs, and, urge that as a matter of contractual right Mr. Morse had the authority to make such purchase.

In reviewing all the evidence pertaining to the stock ownership as effected by the last transaction initiated by Mr. Morse, the Court has concluded that General, in refusing to retire all 96 shares as requested by Mr. Morse and in thus retaining voting control of Morse General, was within its legal rights. Although these 96 shares purchased by General from the Eckhards were subject to retirement out of a portion of the net profits of Morse General [5] there was no intent by the parties making such agreement to require that General permit retirement of such stock if to so do resulted in a relinquishment of control of Morse General while the Morses were still indebted to General. The entire tenor of the business relationship between Mr. Morse and General, and the contracts executed pursuant to such relationship, unequivocally establish that Morse was to remain a mere *employee* of General up to the time all monies owed General by Morse were paid.[6] The demeanor of Morse himself at the time the $10,000 check was sent to General unmistakably implies that he did not consider he could as a matter of contractual right *demand* that General retire such stock and surrender control of Morse General.[7] This practical construction by Morse himself on the effect of the contractual provision in issue is most persuasive as to the true intent of the contracting parties. All his expressions evinced an attitude of sincere appreciation to General for the opportunity it, as an employer, had given him, and he was merely requesting that General either permit the retirement of the 96 shares, or apply the funds in an alternative way satisfactory to General.[8]

5. See agreement of May 26, 1947, between the Eckhards, the Morses and General (DX–5) paragraph 3 (a) which provides: " * * * The remaining fifty per cent (50%) of such profits shall be used in similar fashion to acquire a corresponding portion of the stock purchased under Paragraph 2 above, (that is, the 96 shares purchased from the Eckhards by General for cash) Morse waiving his right to profits under his contract."

6. For example, the agreement between Morse and General dated November 14, 1945 (DX–2) provided in part: "(3) It is contemplated that Morse shall be employed by such corporation (Eckhard-Morse General, now Morse General) but it is understood that so long as any amount remains unpaid Morse shall resign upon demand of General for good cause. (4) In the event of the failure to pay on demand, or Morse is no longer employed by such corporation, then General shall have the right to appropriate all of such stock, in which case it shall credit Morse with the correct book value of such stock and pay to him the excess, if any, thereof." Also, the life insurance policy in effect at the time of the death of Warder A. Morse, from which Mrs. Morse collected $20,000, was only to be valid so long as General was an employer and Morse was an employee of General. (SE DX A–8.)

7. On July 24, 1950, just prior to mailing the $10,000 check, Morse called Claypool (T 341–343.) and said "he had figured out a certain way that if possible he would like to have the funds applied." (T 343, 344.) After such outline Mrs. Claypool testified: "I told him I had no records available and I couldn't say, but I did tell him that we would be glad— we would apply the $10,000.00 to the— to his best advantage, but by the same token we—General Tire and Rubber Company, would have to retain the majority interest in the stockholdings of Morse General Tires" to which Morse acquiesced. (T 344, 345.) The general nature of Morse' conversation with Claypool is confirmed by the letter of transmittal sent with the check wherein Morse wrote: "Dear Olive: Confirming my conversation with you, I am enclosing our check for $10,756.19. *If satisfactory with Mr.* Poor, would like to use this check to retire stock as follows: * * *." (Emphasis supplied.) (DX–11.)

8. Although doubtless Morse had done an outstanding job personally, he could but appreciate that with the $13,000 loan and the opportunity given him in 1946 by General, and an investment of only $6,200 on his own part, he had by July of 1950, in addition to his living expenses, turned his $6,200 into something over $60,000.

Even if the contested provision afforded the absolute right to retire the 96 shares in question, Mr. Morse did not seek to invoke such provision but in fact entered into a separate and independent agreement whereby General was given the right to retire all 96 shares, or in the alternative, apply the proceeds of the $10,000 check in a manner thought best by General.

The refusal of General to retire stock contrary to what its officers deemed to be for the best interest of General, when no legal duty required such sale at the specific time, is no evidence of bad faith on the part of General.

The determination that the Morses had no right to demand the retirement of stock which would give control of the corporation to the Morses, eliminates that element of plaintiffs' charge urging there was a concealment from Mrs. Morse of the fact she actually had, or should have had, control of Morse General. The remaining issue is whether either or both plaintiffs have established a right to recovery based upon the transfer of the assets of Morse General for an amount allegedly less than the *true value* of such assets.

A careful review of the evidence discloses several separate and independent reasons why neither of the plaintiffs can now challenge the regularity and validity of the sale in question.

(1) *There is no evidence of fraud or bad faith by any of defendants in connection with the sale and transfer of the assets of Morse General to Benson General, Inc. and such sale was expressly agreed to by the minority stockholder, Mrs. Morse.*

■ Although the transfer of assets between two corporations having interlocking directorates is carefully scrutinized where minority stockholders of the selling corporation have no actual voice in the transaction,[9] such principle has no application to the facts in the instant case. The minority interest in Morse General was held entirely by Mrs. Morse, either individually or as executrix, and she actively participated in all proceedings leading up to the actual transfer of the Morse General assets. The record is replete with evidence establishing that not only did Mrs. Morse agree that for the good of all the assets of Morse General should be sold to a new corporation,[10] but that Mrs. Morse meticulously considered all matters which culminated in the determination of the ultimate price to be obtained for such assets; and, only after prolonged investigation and consideration on her part, assisted at all times by able counsel,[11] did Mrs.

9. See Geddes v. Anaconda Copper Mining Company, 1921, 254 U.S. 590, 41 S. Ct. 209, 65 L.Ed. 425.

10. Mrs. Morse herself called Benson at Detroit and urged him to come to Oklahoma City and take over the business, (T98–99) remarking to Benson "If you want an organization held together, you had better hurry and get down". (T. 99.)

11. Felix and Griffin of a prominent Oklahoma City law firm represented and counselled Mrs. Morse throughout all these negotiations. A few examples of the care and diligence exercised by both Mrs. Morse and her counsel are: (1) On September 16, 1950, Felix wrote Knowlton (PX 7–f) and acknowledged that his firm represented Mrs. Morse. In addition, Felix discussed the proposed plan of settlement in detail and observed: "After analyzing with Mrs. Morse your outline of the proposed program for handling the entire matter as it existed on July 31st, we believe same is satisfactory with two exceptions * * *. Both of these exceptions are based on the fact that your proposal does not include the purchasing by the new company of the accounts receivable and assuming all liabilities other than Federal or State income taxes, as was our original conception."; (2) On November 9, 1950, Griffin wrote Knowlton (DX–13) and advised him of Mrs. Morse's dissatisfaction with Funk's audit as to the "value of the going business" and concluded, "Mrs. Morse said that she would like to have Mr. Felix's personal advice on the matter and would prefer to discontinue negotiations until his return to Oklahoma City. Accordingly, it would please both Mrs. Morse and Mr. Felix if Mr. Poor could arrange to come to Oklahoma City after Mr. Felix's return from New York on November 20th". (3) On December

Morse designate her approval of the sale and accept her portion of the purchase price from purchaser Benson General.[12] From the very inception of the negotiations Mrs. Morse agreed that the "book value" of the stock was to be the standard used to determine the sales price of the corporate assets.[13] Mrs. Morse fully understood the significance of using such a formula to determine the value of her holdings and in reaching a final settlement figure with the purchaser of her interests, she traveled every conceivable avenue and exercised the highest degree of care in obtaining the utmost for her interests.[14]

 Plaintiffs make no contention that "book value" was not in fact paid for the Morse General assets, but contend that some other norm should have been applied to appraise the true value of Morse General stock, inasmuch as the "book value" test did not fairly represent the true value of Morse General as a going business. However, plaintiffs at this time have no standing to raise such

5, 1950, Felix again wrote Knowlton (DX–17) and advised him Mrs. Morse was on her way to Akron to talk with Knowlton. In this letter Felix enclosed a copy of the proposed agreement. Although observing Mrs. Morse' dissatisfaction with the then existing form of the agreement, Felix stated, "However, basically there are only minor differences in the handling of certain specific items, all of which we have previously discussed."; (4) On December 13, 1950, a number of changes by way of notation were made in the proposed settlement agreement (DX–19), after which Mrs. Morse initialled her approval. (See T 437; Morse, dep. 35); (5) During all this time Mrs. Morse was in close contract with her counsel (Mrs. Morse, dep. 110, 111) and as observed by Mrs. Morse "So I just kept on trying to get a little bit better settlement out of them." (Morse, dep. 152.)

12. On January 13, 1951, Funk exchanged checks with Mrs. Morse at which time, in Mrs. Morse' presence, Mr. Felix remarked: "Upon exchange of these checks, the deal is closed." Funk left the $60,000 check, the minute book, the stock book, the certificate book, the stock certificates and seal and took the $9,300 check of Mrs. Morse. (T 574–576.)

Significantly, after receiving the $60,-000 check in January Mrs. Morse did not cash same until July. During this interim Mr. Griffin wrote Knowlton on February 10, 1951, (DX–24) a very lengthy letter pointing out four main items with which Mrs. Morse was not yet satisfied. Also, in March, upon advice of her attorneys (Mrs. Morse, dep. p. 164) Mrs. Morse employed her own auditors to check the reliability of the audit made by Funk. An exhaustive audit was made, the results of which were reported to Mrs. Morse in May. (T 301.) Then, on July 6, 1951, Mrs. Morse, then

president and sole stockholder of Morse General, endorsed the $60,965 check "Morse-General Tires, Inc. By Sally A. Morse, President" and received the cash therefrom. (See DX–30.)

13. By December 13, 1950, Mrs. Morse had discussed several times with Mr. Funk the manner in which the audit was to be conducted and how the book value of the business would be determined and as stated by Mrs. Morse. "I knew how it was being handled". (Mrs. Morse, dep. 145.) Also, plaintiff's redraft of the proposed agreement (DX 17–3) which was enclosed in Felix's letter to Knowlton of December 5, 1950 (PX–17) contained the provision: "Third. That the consideration to be paid by said corporation to First Party for the sale, transfer and exchange of said assets and properties shall be equal to the aggregate of the net book values of said assets (same being determined after proper allowances for depreciation) as of the close of business July 31, 1950, * * *". Such audit shall be made in accordance with the manual and method of accounting currently in effect for retail operations in which the General Tire & Rubber Company has an investment and all adjustments resulting therefrom shall be reflected in the determination of such net book value."

14. As late as February 21, 1952, Mrs. Morse requested General to pay her audit and attorney expenses (DX–42) in reply to which letter Knowlton wrote on March 12, 1952 (DX–43): " * * * In accordance with our understanding that all pending matters have now been fully disposed of I am enclosing herewith our check in the amount of $2,102.00 which covers the audit, appraisal and attorneys' fees which you incurred. I am very glad that our difficulties have now been straightened out and that nothing further is pending between us."

an issue, even assuming a more satisfactory method of appraisal could have been used, inasmuch as the "book value" test was agreed to by all interested parties, right from the outset, was accepted throughout the lengthy negotiations and was knowingly adopted in the final settlement between the parties. Somewhere there must be a binding determination of the legal rights of parties dealing in business; and, it is fundamental that a contract cannot be vitiated merely because one party discovers a bad business bargain has been made.[15] Naturally, if fraud or concealment inhered in the instant negotiations the agreement between the parties might be vulnerable to attack. However, during this entire business transaction the plaintiffs either knew, or should have known, all the facts now being urged as evidencing fraud by the defendants in the contested negotiations; [16] and, the issue of whether sufficient consideration was being paid for the Morse General assets was pointedly considered by all parties prior to the time the agreement to sell was executed.[17]

(2) *The agreement authorizing the disposal of the Morse General assets, even if fraudulently obtained, has been affirmed by the election of plaintiffs to accept all benefits accruing thereunder.*

 Mrs. Morse, the sole minority stockholder of Morse General, agreed to sell her interests and make the necessary formal conveyances upon receipt of the purchase price due her to be calculated in a specific manner as detailed in the written agreement of December 13, 1950. In furtherance of such agreement the negotiations continued until January 13, 1951, when Mrs. Morse accepted a check which was understood to represent the purchase price of Mrs. Morse's entire interests. From the time of the receipt of the check until July 6, 1951, the time she

15. Actually, the Court is satisfied from the introduced evidence that a fair and reasonable price was paid for the assets of the plaintiff corporation and that the "book value" test in theory and in application to the assets in question resulted in a fair and equitable determination of the value of the Morse General stock.

16. A major item urged by Mrs. Morse is that no value was ascribed to the "Hawkinson License Agreement" a process used in retreading tires. However, such licensed process was never carried on the books of the Morse General, or any other, General affiliate, at any value (Poor, dep. 110–111; T–569–593) all of which was known by Mrs. Morse. In addition, the fact that such license was not given a value in the audit by Mr. Funk was known by Mr. Griffin sometime in October or November, 1950; and, was again specifically brought to plaintiffs' attention by their own auditor, Mr. Latta, in May, 1951, prior to the time Mrs. Morse cashed and used the $60,000 purchase price check. Also, the Contract of Sale between Morse General, Joseph H. Benson and General signed sometime in December, 1950, (DX–12) the provisions of which had been approved by Mrs. Morse earlier in December (DX–19) expressly included the phrase "and including all interest in the Hawkinson Franchise and Equipment."

 Significantly, the Hawkinson Franchise came into the assets of Morse General without the payment of specific consideration and was never capitalized (PX–9; DX–29, 29A–29D) and at the time the Eckhards' interests were purchased in May, 1947, the Eckhards were paid "book value" for their interests, receiving nothing specifically for their interest in the Hawkinson Franchise, (See DX–5) which franchise the Eckhards had assigned pursuant to the pre-incorporation agreement involving Eckhard-Morse General, dated January 2, 1946 (PX–9).

17. On November 9, 1950, Griffin wrote Knowlton (DX–13): "At a conference in our offices today between Mrs. W. A. Morse, her son Tom, Jack Funk and the undersigned, there was discussed the proposed contract involving the above captioned subject matter. After discussion with Mrs. Morse of the revised July 31, 1950, balance sheet of Morse General Tires, Inc., prepared by your auditor, Mr. Jack Funk, it was learned that there exists a wide difference of opinion between Mrs. Morse and the General Tire and Rubber Company as to the value of the going business." A person urging fraud is charged with the knowledge of facts both in his possession and which inquiry and reasonable diligence would have discovered. H. F. Wilcox Oil & Gas Co. v. Diffie, 10 Cir., 1950, 186 F. 2d 683; Gulf Coast Western Oil Co. v. Trapp, 10 Cir., 1949, 174 F.2d 339; Widger v. Union Oil Co., 1952, 205 Okl. 614, 239 P.2d 789.

finally cashed the check (as president and sole stockholder of Morse General) Mrs. Morse reconsidered the facts inherent in the final settlement. By the time the check was cashed in July of 1951, Mrs. Morse either knew, or was chargeable with notice of all the facts which she now alleges to be fraudulent, and her acceptance and personal appropriation of such purchase price must amount to an affirmance of the agreement between the parties. A contract obtained through fraud is voidable and not void and is deemed affirmed where the defrauded party by his conduct elects to accept the benefits coming under such contract.[18] The fact that Mrs. Morse, presently the sole stockholder in Morse General, has failed to execute a formal "Bill of Sale" is immaterial to the legal effect and validity of the transfer of the assets of Morse General to defendant General's subsidiary, Benson General. Mrs. Morse specifically agreed with General to transfer her interests in the assets for a consideration to be determined in the future in conformity with a definite formula;[19] and, defendants Poor and Knowlton while directors of Morse General (and representatives of the majority stockholder) contracted for Morse General to sell and transfer to Benson General all assets upon the fulfilment of certain conditions. All consideration and conditions running in plaintiffs' favor called for in these agreements have long been met and "That which has been agreed to be done will be considered as done." Equity frowns upon an attempt, such as the instant one, to rely upon legal informalities to vitiate the effect of an agreement between stockholders.[20]

█ Although plaintiff corporation technically was not a party to the agreement between Mrs. Morse and General (the majority stockholder of Morse General) it is now estopped to challenge the validity of the transfer of corporate assets inasmuch as it as a corporate person, through the instrument of Mrs. Morse the sole stockholder of the corporation at the time of the cashing of the check for Mrs. Morse's minority interests in the corporate assets, has with Mrs. Morse accepted all the benefits accruing from the transfer of such assets in conformity with the agreement and cannot now be heard to repudiate the correlative duties attendant with such transfer.

(3) *Plaintiffs' claims for relief based on fraud are barred by the statute of limitations.*

Apart from the merits of the case at bar, the plaintiffs' charges of fraud, both as to the concealing by defendants of the actual ownership and control of Morse General as well as the companion charge that defendants in bad faith illegally and fraudulently disposed of corporate assets at an inadequate price, were not timely asserted.

█ Mrs. Morse knew all basic facts upon which the present charges of fraud are founded more than two years prior to the institution of this action.[21] She was aware of the issue of corporate control and of the possibility that she either owned, or was entitled to control

18. See Wrightsman v. Brown, 1937, 181 Okl. 142, 73 P.2d 121; Smith v. Reinauer, 1936, 178 Okl. 4, 61 P.2d 1039.

19. See DX–18.

20. As observed in Bass & Harbour Furniture & Carpet Co. v. Harbour, 1914, 42 Okl. 335, 140 P. 956, Syl. 2: "Unanimous consent and acquiescence of the stockholders, acted on by the parties concerned to such extent as to materially change their position, preclude the assenting stockholders as individuals and the corporation as such from afterwards setting up legal informalities in matters of internal concern affecting only the interests of the stockholders, to the overthrow of rights that have been acquired on the faith of the consent and acquiescence." That all interested parties took part in the negotiations in question is emphasized by the fact that plaintiff Mrs. Morse either owned personally or as sole devisee of Mr. Morse all the minority stock in question; and, as executrix of the estate of W. A. Morse, was under the will clothed with absolute authority "to compound, compromise, settle and adjust all claims and demands in favor of or against my (W. A. Morse) estate; * * *". (DX–1.)

21. See 12 Okl.Stat.1951 §§ 92, 95(3).

 

plaintiff corporation.[22] In addition, she was apprised that the corporation assets were to be disposed of on a "book value" standard and that no special allowance for "good will" or the "Hawkinson Retreading Franchise" (a component part of any such good will) was to be allowed. All pertinent accounting statements and records were not only presented to her but plaintiff's own attorney expressed approval thereof;[23] and, the check given in final settlement was delivered to Mrs. Morse on January 13, 1951. Inasmuch as the statute of limitations begins to run on a cause pitched in fraud from the time of the discovery of the fraud or from the time when with reasonable diligence the fraud could have been noted, the statute as to the instant case began to run no later than January of 1951, the latest possible time the alleged fraudulent claims could have had their geneses; and, the filing of this action in April of 1953 was beyond time.

The defendants are entitled to judgment. Counsel should submit a journal entry which conforms with this opinion, within twenty days from date.

22. As early as August 9, 1950, Mrs. Morse raised the point with Mr. Poor that she thought she and her husband were in voting control of Morse General. (T-86.)

23. Sometime in October or November of 1950, Mr. Griffin told Funk: "You have made a very good audit and strictly in line with the agreement". (T 571-572.)